# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

June 11, 2014

Lyle W. Cayce
Clerk

No. 13-60131

WHITEHOUSE HOTEL LIMITED PARTNERSHIP; QHR HOLDINGS – NEW ORLEANS LIMITED, Tax Matters Partner,

Petitioners – Appellants

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent – Appellee

Appeal from the Decision
of the United States Tax Court

Before STEWART, Chief Judge, and GARZA and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

This appeal marks the second time Whitehouse Hotel Limited Partnership appeals from a ruling of the United States Tax Court disallowing a significant portion of a tax deduction claimed for a historic conservation easement. Whitehouse also appeals the tax court's enforcement of a 40 percent gross overstatement penalty. We AFFIRM the determination of the amount of the deduction but VACATE the penalty.

No. 13-60131

## FACTUAL AND PROCEDURAL BACKGROUND

Whitehouse was formed in 1995 to purchase the Maison Blanche building in New Orleans, renovate it, and reopen it as a Ritz-Carlton hotel and condominium complex with retail space. Built between 1907 and 1909, the Maison Blanche is located on Canal Street in the city's Central Business District. The building was listed on the National Register of Historic Places in 1966 and designated a City of New Orleans landmark in 1980. Whitehouse's development plan included combining the Maison Blanche with the contiguous Kress building. Whitehouse also owned a parking garage in the immediate vicinity which would be utilized in the new complex.

On December 29, 1997, Whitehouse conveyed a conservation easement to the Preservation Alliance of New Orleans, d/b/a Preservation Resource Center (PRC), a Louisiana nonprofit corporation dedicated to historical preservation. The easement burdens the Maison Blanche with a number of restrictions and affirmative obligations, all revolving around maintaining the appearance of the ornate terracotta façade.

In its 1997 tax return, Whitehouse claimed a $7.445 million charitable contribution deduction for the easement. In 2003, the Commissioner issued Whitehouse a Notice of Final Partnership Administrative Adjustment, which allowed a deduction of only $1.15 million for the easement. The Commissioner further assessed a gross undervaluation penalty of 40% of the portion of underpayment of tax that year. *See* 26 U.S.C. § 6662(h)(2).

Whitehouse challenged both the valuation of the easement as well as the gross undervaluation penalty in the tax court. *See Whitehouse Hotel Ltd. P'ship v. Comm'r*, 131 T.C. 112 (2008). The 2006 trial focused on the pre- and

No. 13-60131

post-easement valuation of the Maison Blanche building.[1]  The difference in value represents the value of the conservation easement and therefore the amount of the permissible deduction in the year of conveyance.  *See* 26 C.F.R. 1.170A–14(h)(3).

At trial, Whitehouse presented the expert testimony of Richard Roddewig,[2] while the Commissioner proffered that of Dunbar Argote.  As we held in our 2010 decision reviewing that decision, both Roddewig and Argote were well-qualified to evaluate, appraise, and testify about commercial real estate.  *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 326 (5th Cir. 2010).  The expert reports, testimony, and cross-examination of Roddewig and Argote are at the center of this controversy.  The two appraisers reached widely varying conclusions regarding the proper parameters and valuation methods to use in their valuations.  They arrived at vastly different pre- and post-easement valuations.

The two appraisers did not agree even on what property they were to evaluate.  Roddewig included the adjacent Kress building in his valuation because it was to be brought under common ownership the day after creation of the easement.  Argote determined the relevant property was the Maison Blanche by itself.[3]  The two appraisers further disagreed over the "highest and best use"[4] of the Maison Blanche building and complex, even to the point of disagreement over how the easement itself would affect the highest and best

---

[1]  No one disputes that the conservation easement is valid under I.R.C. § 170(f)(3)(B)(iii) and 26 C.F.R. § 1.170A–14.

[2] Richard Cohen, who prepared the appraisal upon which the deduction was based, could not testify due to a serious illness.  Richard Roddewig prepared an appraisal for the trial.  We discuss Roddewig's appraisal in our analysis of the tax court's valuation.  Below, we discuss the Cohen appraisal in the context of whether or not Whitehouse should have relied on it for the purposes of I.R.C. § 6664(c)(3)(A).

[3] Neither appraiser included the parking garage.

[4] For a general discussion of this somewhat tax-specific term-of-art, see *Stanley Works and Subsidiaries v. Comm'r*, 87 T.C. 389, 400 (1986).

use of the parcel. Roddewig concluded the highest and best use of the complex would be a 780-room, all-suite luxury hotel, 60 of those rooms being in a nine-story addition that would be constructed atop the Kress to bring its height nearer to that of the taller Maison Blanche, and ground-level retail space. As discussed more thoroughly later, Roddewig believed the conservation easement prohibited the 60-room addition to the Kress because the new floors would impair sightlines for the façade. Therefore, the post-easement highest and best use would be limited to 720 rooms. Conversely, Argote found that the easement did not limit an addition to the Kress building. He also determined the building's highest and best use was as a mixed-room, non-luxury hotel.

Roddewig's appraisal considered three methods to evaluate the pre- and post-easement value of the Maison Blanche: replacement cost, income, and comparable sales. These methods yielded pre-easement values of $43 million, $29.5 million, and $40 million, respectively. Post-easement, the values were $35 million and $18 million for the first two methods, and, after deciding there were no comparable sales of encumbered historic buildings, he made no valuation under that method. Roddewig estimated a value pre-easement of $41 million and post-easement of $31 million, leaving an easement value of $10 million. Argote used only the comparable sales method in his valuation. He concluded the Maison Blanche was worth $10.3 million pre- *and* post-easement. Consequently, he valued the easement at zero dollars, a conclusion which we in 2010 labeled "rather extraordinar[y]." *Id.* at 327.

In a 94-page opinion issued on October 30, 2008, a little over two years after the trial, the tax court blended analysis from the expert reports. In weighing the two reports, it reached several conclusions regarding the parameters, assumptions, and valuation methods used by the two appraisers.

First, the tax court concluded there was no difference in the highest and best use before and after the conveyance of the easement because the easement

No. 13-60131

did not prevent building rooms atop the Kress. *Whitehouse Hotel*, 131 T.C. at 133-35. Second, it held that use of the reproduction cost approach was inappropriate because the building or façade would not be rebuilt if destroyed. *Id.* at 147-48, 52. Third, it concluded the income approach was inappropriate because it rested upon a number of assumptions about income and expenses and did not contain any measure of overall risk of error in his income model. *Id.* at 154-55. Ultimately, the tax court determined a pre-easement value of $12,092,301[5] and a post-easement value of $10.3 million.[6] The value of the easement, then, was $1,792,301. That valuation meant that Whitehouse overstated its deduction by $5,652,699, the difference between $7,445,000 and $1,792,301. The overstated deduction meant that Whitehouse had claimed a deduction roughly 415% higher than its proper value ($7,445,000 / $1,792,301 = 4.15). *Id.* at 172. If a taxpayer misstates a deduction by 400% or more, a penalty of 40% of the underpayment may be charged as a penalty for a "gross valuation misstatement." I.R.C. § 6662(h)(2)(A)(i). A taxpayer may be relieved of this penalty if the taxpayer shows the misstatement falls into the "reasonable cause exception." I.R.C. § 6664(c)(1). To qualify for this exception, the taxpayer must show the claimed value was based on a qualified appraisal by a qualified appraiser and that the taxpayer made a good faith investigation of the value of the property. I.R.C. § 6664(c)(3).[7] Concluding Whitehouse had presented no evidence to show it had undertaken the steps required in Section

---

[5] The tax court reached this conclusion by averaging the adjusted price per square foot of three comparable sales and multiplying it by the square footage of the Maison Blanche-Kress parcel. *See Whitehouse Hotel*, 131 T.C. at 168.

[6] The tax court merely accepted this conclusion from the Commissioner's expert, Argote.

[7] In our 2010 opinion, we refer to I.R.C. § 6664(c)(2) as containing the reasonable cause exception. In the interim, that provision was moved to Section 6664(c)(3).

No. 13-60131

6664(c)(3), the tax court determined that the requirements of the good faith exception had not been met. *Whitehouse Hotel*, 131 T.C. at 175.

Whitehouse appealed to this court. We rejected several arguments but remanded for further consideration on three valuation issues and the denial of the good faith exception. *Whitehouse Hotel*, 615 F.3d at 330-31. We were concerned that the tax court did not make an explicit determination of the parcel's highest and best use, *id.* 336-37, and that it failed to consider the effect of the easement on the Kress. *Id.* at 339-40. Thus, our instructions on remand were these: (1) reconsider all valuation methods, not just the comparable sales method; (2) determine the parcel's "highest and best use" for the purposes of its valuation; and (3) consider the effect of the easement on the Kress building, even if the easement itself did not specifically burden that building under relevant Louisiana law. Having vacated the tax court's valuation of the easement, we also vacated the gross undervaluation penalty. *Id.* at 343. We discussed relevant legal principles to guide the tax court on imposing a penalty should it decide again the incorrect valuation of the easement gave rise to one. *Id.* at 340-41. Though we did not hold that the proper frame of valuation was to be what the property would be following its renovation, we did direct the tax court to determine whether the highest and best use would be as the luxury hotel actually being built or instead as a non-luxury hotel. *Id.* at 336-37.

On remand, the tax court again analyzed the easement's effect on the Kress building. It quoted our decision that "because of the easement, Whitehouse could not build on top of the Kress building." *Id.* at 337. That conclusion had rejected the 2008 tax court determination on the effect of the easement on the Kress. Nonetheless, the tax court judge (the same judge wrote both the 2008 and 2012 opinions) discussed Louisiana's law of servitudes at length and concluded we had been in error: any restriction on development that is not expressly contained in an easement cannot be used in valuation of

6

that easement. *Whitehouse Hotel Ltd. P'ship v. Comm'r*, 139 T.C. 304, 339-40 (2012). Having confirmed its continuing disagreement, the court then enforced our contrary holding that some effect on the valuation of the entire parcel must occur as a result of the easement. The tax court "reconsider[ed] the value of the servitude on the assumption[] that . . . [the easement] restricts the partnership from building atop" the Kress. *Id.* at 347.

The tax court responded to our directive to *reconsider* the highest and best use of the parcel by saying it was unnecessary "to choose between the two experts' opinions of highest and best use." *Id.* at 337. The tax court concluded that, at the date of the easement, the proper valuation was not of the under-development luxury hotel, but rather a "shell building[] . . . suitable for conversion to [a] hotel." *Id.* The tax court would therefore only undertake a comparable sales analysis of comparable "shells," which could be converted into any type of hotel. Having once again rejected the reproduction cost and income methods,[8] it proceeded to reapply its price-per-square-foot version of the comparable sales calculation, except that it added the square footage of the Kress to that of the Maison Blanche. *Id.* at 347-48. The tax court ultimately concluded that the before-restriction value was $12,473,236,[9] it adjusted its after-restriction value to $10,615,520,[10] and thus valued the easement at merely $1,857,716. Consequently, the tax court determined that Whitehouse had overstated its claimed deduction by the difference between $7,445,000 and $1,857,716, or $5,587,284. That difference amounted to a 401% overstatement: $7,445,000 / $1,857,716 = 4.01.

---

[8] This rejection is discussed below.

[9] $23.50/sq. ft. multiplied by a new square footage of 530,776 following the addition of the Kress's 16,210 square feet.

[10] Again following Argote's determination of $20/sq. ft. using the comparable sales method, $20 multiplied by 530,776.

No. 13-60131

Because the new valuation still resulted in application of the gross undervaluation penalty, the tax court reconsidered whether Whitehouse qualified for the good faith exception. As mentioned above, the exception requires a showing that the claimed deduction was based on a qualified appraisal and, in addition, making a good faith investigation of the easement's value. I.R.C. § 6664(c)(3)(A)-(B). While the Commissioner concedes that the Cohen appraisal was qualified, it held that Whitehouse presented no evidence tending to show anyone had undertaken a good faith investigation. Because it so found, it could only hold that no good faith investigation was made into the valuation of the easement. Once again, Whitehouse appeals the valuation of the easement and the enforcement of the penalty.

## DISCUSSION

Decisions of the tax court are reviewed in the same manner as decisions of a district court following trials of cases without a jury. 26 U.S.C. § 7482(a); *Green v. Comm'r*, 507 F.3d 857, 866 (5th Cir. 2007). "Findings of fact are reviewed for clear error and conclusions of law are reviewed de novo." *Id.* Valuation is a mixed question of law and fact and valuations flowing from legal conclusions about "rights inherent in the property" are reviewed *de novo*. *Whitehouse Hotel*, 615 F.3d at 333.

Whitehouse argues four points of error in the tax court's analysis on remand. First, Whitehouse urges that the tax court erred by concluding the easement did not affect the Kress Building. Second, Whitehouse argues that the tax court failed to comply with our instruction to find the highest and best use of the parcel, before and after the easement. Third, Whitehouse argues that the tax court erred by rejecting the cost and income approaches and by rejecting Roddewig's use of non-local comparable sales. Finally, Whitehouse

8

argues it is entitled to the good faith defense to the gross undervaluation penalty.  We address each argument in turn.

## I.     *The Effect of the Easement on the Use of the Kress Building*

Whitehouse argues that the tax court's painstaking reinterpretation on remand of Louisiana law regarding servitudes, coupled with its announcement that it saw "daylight" in this court's mandate, amount to ignoring that mandate.  *See Whitehouse Hotel*, 139 T.C. at 338-40.  We agree the tax court went out of its way to state its continuing disagreement with parts of our analysis, but we do not find that it ignored our directives.

In our opinion remanding the case, we held that "the tax court erred in not determining [the] effect" of the easement on the "fair market value of the Maison Blanche and Kress buildings."  *Whitehouse Hotel*, 615 F.3d at 339.  We held that the easement effectively prohibited building 60 additional rooms on top of the Kress building, and it was for the tax court to decide on remand how that affected the property's fair market value.  *Id.* at 340.  On remand, the tax court gratuitously reviewed Louisiana law and restated its conclusion that the easement did not affect the right to build on top of the Kress building.  *Whitehouse Hotel*, 139 T.C. at 342-47.  Despite that statement of continuing disagreement, the tax court stated: "Notwithstanding our conclusion about the terms of the conveyance, we shall, consistent with the instruction of the Court of Appeals, reconsider the value of the servitude" assuming Whitehouse cannot build on top of the Kress and that the two buildings are unlikely to be separately owned in the future.  *Id.* at 347.

Whitehouse interprets the tax court's rehearsal of its easement analysis, as well as its proclamation that it saw "daylight" in our mandate to re-examine the conveyance, as evidence of judicial insubordination which "infects the entire Remand Opinion."  Our question is not whether the tax court was

unenthusiastic about our directives. We only need to answer whether they were followed. Even though the tax court determined that our conclusion about the effect of the easement on the Kress building was error, it did not ignore our instruction to include the Kress in its valuation. To the contrary, the tax court explicitly stated it would reconsider the valuation of the easement on the assumptions we articulated. *Id.* Begrudging compliance with our mandate is nonetheless compliance. Because we only directed that the valuation be reconsidered and did not state a range of acceptable outcomes following reconsideration, the mandate was not ignored.

## II.     *Highest and Best Use*

In our 2010 opinion, we noted the importance of determining a property's highest and best use for valuation purposes. *Whitehouse Hotel*, 615 F.3d at 335. "A property's highest and best use is the reasonable and probable use that supports the highest present value." *Id.* (quotation marks and citation omitted). "The key inquiry," we continued, "is what a hypothetical willing buyer would consider in deciding how much to pay for the property." *Id.* We cautioned that uses that a hypothetical buyer would not reasonably consider should not be considered. *Id.* (citing *Stanley Works*, 87 T.C. at 402).

In our 2010 opinion, we noted that the tax court "did not explicitly rule" on the highest and best use of the Maison Blanche. *Id.* From the record before us and the tax court's 2008 opinion, we could not decipher the tax court's finding on the Maison Blanche's highest and best use. *Id.* at 335-36. "[T]he tax court's decision can be construed in two ways: if the highest and best use was a Ritz-Carlton, that had no effect on the property's value; or, a non-luxury hotel was the highest and best use." *Id.* at 336. Either outcome, we held, would require further consideration by the tax court on remand. *Id.* at 336-37. If the tax court determined the highest and best use to be a Ritz-Carlton, we

opined, such would require reconsideration of its rejection of Roddewig's non-local comparable sales. *Id.* at 336. If the tax court determined the highest and best use to be a non-luxury hotel, then it would be required to justify such a decision in light of the "highly unlikely . . . conjecture" that this particular project would not come to fruition. *Id.* at 337.

On remand, the tax court accepted that "finding a property's highest and best use is critical for determining its fair market value." *Whitehouse Hotel*, 139 T.C. at 331. Nonetheless, it held "the highest and best use of property does not itself identify the fair market value." *Id.* In support of this position, the tax court cited a Supreme Court decision that held "the highest and most profitable use . . . is to be considered, not necessarily as the measure of value, but to the full extent [it] affects the market value" of the property. *Olson v. United States*, 292 U.S. 246, 255 (1934). The tax court concluded that it did "not need to choose between the two experts' opinions of the highest and best use" of the Maison Blanche. *Whitehouse Hotel*, 139 T.C. at 337. Even if the highest and best use of the property at the time of the conveyance was as a Ritz-Carlton hotel, that use would not control the valuation. *Id.* The tax court rejected Roddewig's conclusion that luxury hotel developers would pay more for buildings than non-luxury hotel developers. *Id.* at 336. It also "accept[ed] Mr. Argote's methodology and his view that the value of the subject property" is to be determined as a shell capable of conversion into any type of hotel, not as a particular type. *Id.* at 337.

Once again, Whitehouse contends we foreclosed such a holding in our prior opinion. For the tax court to reject Roddewig's appraisal a second time and accept Argote's, according to Whitehouse, ignored our mandate. Not so. We remanded for the tax court to establish explicitly the highest and best use of the parcel for valuation purposes. Though the tax court's opinion on remand contained many observations discounting the need for such a finding, it did

make the finding we requested. Whitehouse read our prior opinion as implying that accepting Argote's opinion that the highest and best use of the parcel was as a non-luxury hotel would be error. Though we did call Argote's opinion "implausible," we did not instruct the tax court that it was forbidden to accept it. *Whitehouse Hotel*, 615 F.3d at 337. The tax court on remand concluded that the highest and best use of the property could be either a luxury hotel or non-luxury hotel, and that the Maison Blanche's value would not be increased by which one it ultimately became. *Whitehouse Hotel*, 139 T.C. at 334.

We left the determination of the parcel's highest and best use open on remand. The tax court gave the highest and best use of the Maison Blanche parcel all the weight it thought necessary. *See Olson*, 292 U.S. at 255. We again conclude that the tax court did not ignore our 2010 mandate.

### III.    *Valuation Methods*

In our prior opinion, we required that the tax court reconsider three valuation methods: reproduction cost, income, and comparable sales. *Whitehouse Hotel*, 615 F.3d at 335. We declined to state whether the tax court's 2008 rejection of the reproduction cost and income methods was error. *Id.* We did not find error in any considerations the tax court expressed when it addressed the experts' valuation method choices in its 2008 decision. On remand, the tax court once again rejected the reproduction cost approach because reproducing the historic façade after complete destruction would make no business sense. It again rejected the income approach because the evidence upon which Roddewig's income calculations were based was found to be unreliable. Finally, it concluded that there were enough local comparable sales to make consideration of non-local comparable sales unnecessary. Whitehouse ascribes error to each of these restated conclusions.

No. 13-60131

*A. The Reproduction Cost Approach*

We find scarce precedent as to the suitability of the reproduction-cost method in the conservation easement context. The tax court in both of its decisions in this case rejected the reproduction cost method because there would be little business reason to restore a historic structure to its historic form were it to be completely destroyed. *See Whitehouse Hotel*, 139 T.C. 315-16. The one Supreme Court precedent cited by the tax court suggested that reproduction cost was unhelpful when "no one would think of reproducing the property." *United States v. Toronto, Hamilton, & Buffalo Nav. Co.*, 338 U.S. 396, 403 (1949). In a 1960 decision, we held that reproduction cost is inappropriate absent "a showing that substantial reproduction would be a reasonable business venture." *United States v. Benning Hous. Corp.*, 276 F.2d 248, 250 (5th Cir. 1960).

Whitehouse's argument rests mostly upon the language of the easement requiring it to "repair, renovate, or reconstruct the damaged or destroyed parts" of the façade. The Commissioner responds simply by pointing out that rebuilding the parcel or façade were it completely destroyed would be highly unlikely. The easement itself distinguishes between partial and total loss:

> 10. In the event of a fire or other casualty which results in damage to or loss or destruction of a part of the Facade or the structural elements of the Improvement, Owner [Whitehouse] agrees promptly to repair, renovate, or reconstruct the damaged or destroyed parts of the Facade or the structural elements of the Improvement with the prior consent and approval of Donee [PRC] as otherwise provided herein.

> 11. In the event of a total loss or destruction of the Improvement, Owner shall promptly remove all debris and trash and properly maintain the Land. Owner must obtain Donee's written approval of and prior consent to any construction or reconstruction of the Improvement, as provided herein.

13

No. 13-60131

The parties have not focused on these provisions, but Whitehouse's clear obligation to rebuild is for loss or destruction of a part of the façade; destruction of the entire building does not have such clear language.

Whitehouse seeks to distinguish the cases the tax court used to explain the unlikelihood of rebuilding because they did not involve historic buildings or conservation easements for historic property. Regardless of such distinctions, the tax court made the relevant finding in this case when it said that Whitehouse "cannot show that it would be a reasonable business venture to reproduce so old a building." *Whitehouse Hotel*, 139 T.C. at 316. We see no error in that finding.

The tax court did not err in determining it would make no business sense to reproduce the building and façade were they to be completely destroyed. Furthermore, our 2010 opinion neither analyzed nor rejected such a conclusion. The tax court's restating the conclusion was not erroneous.

We recognize Whitehouse's argument that reproduction cost of the façade, as opposed to the entire building, might be relevant in valuing the easement. The tax court's analysis appeared to reject the reproduction cost valuation method, at least in part, because it did not think anyone would reproduce an old building in its original form. Even though rebuilding the entire façade might raise the same business-value questions as rebuilding the entire building, reproducing or repairing some substantial portion of the façade might be a significant burden that arises only because of the existence of the easement. The more limited repairs, though, might make business sense. Such obligations could diminish the value of the building to a potential owner, since the later owner would bear that cost.[11] Nonetheless, we do not believe

---

[11] The tax court noted Whitehouse has already spent more than $8,000,000 on repair and maintenance of the façade between 1998 and 2012. *Whitehouse Hotel*, 139 T.C. at 318.

this argument is enough to overcome the tax court's conclusion with regard to the reproduction cost method. There was no error when the tax court rejected the reproduction cost method for valuation of the easement.

### B. Income Approach

As with the reproduction cost approach, there is little precedent discussing when the use of the income approach is appropriate. The tax court cited several of its own prior opinions which allow the use of the income method in the conservation easement context; those cases did not employ a discounted cash flow method but instead used a profit-based method. *See Symington v. Comm'r*, 87 T.C. 892 (1986). The tax court on remand also cited a long line of cases, often affirmed by other circuits, rejecting the income method as not useful if ample comparable sales were available for valuation. *See Whitehouse Hotel*, 139 T.C. at 324-25. These authorities indicate the income or earnings methods in valuation of real estate are less favored than comparable sales data. *See, e.g., Pittsburgh Terminal Corp. v. Comm'r*, 60 T.C. 80, 89 (1973) ("[E]xpert witness demonstrated the folly of trying to estimate the value of undeveloped property by looking to its anticipated earnings."). Nonetheless, the tax court stated it was "not hostile to the income approach to determining value." *Whitehouse Hotel*, 139 T.C. at 324. The tax court's rejections, in both of its opinions in this case, flowed primarily from its conclusion that Roddewig's income model was prone to error and based on too many unverifiable assumptions. *Id.* at 326-27. We did not in our 2010 opinion limit the tax court's reconsideration of the income method, and certainly did not require its use.

Whitehouse argues the income method is appropriate because hotels are income properties. Valuing a property based on the income it is expected to produce is common practice among investors in hotel properties. Whitehouse suggests that our previous opinion impliedly directs the tax court to analyze future potential earnings of the completed project. We stated:

15

No. 13-60131

> The income method involves analyzing data from comparable properties to determine the property's earnings capacity, operating expenses, and rates of capitalization and discount. This information is combined with any reasonably clear and appropriate evidence of future income potential and expenses to estimate the property's value.

*Whitehouse Hotel*, 615 F.3d at 334 (quotation marks omitted).

From this language, Whitehouse asserts that the absence of an earnings history for the Maison Blanche should not have weighed heavily on remand. The Commissioner counters that the tax court's primary disagreement with Roddewig's analysis was not necessarily that he was making assumptions and projections, but that the model he created from his estimates and assumptions had no stated provision for risk of error. That is, the model itself had not been tested for its sensitivity to small changes. The tax court reiterated this in its opinion on remand. *Whitehouse Hotel*, 139 T.C. 326-27.

While the use of the income method, as noted by the tax court, is not *a priori* unacceptable for any valuation purpose, no precedent ascribes error to the tax court's rejection of it in these circumstances. Whitehouse's contention that the tax court erroneously rejected the income approach fails.

*C. Comparable Sales Only Determination*

As a consequence of its rejecting both the reproduction cost and income methods of valuation, the tax court used only the comparable sales method, as it also had in 2008, to determine the value of Whitehouse's conservation easement. As discussed above, this valuation was modified only by the inclusion of the Kress's square footage with the square footage of the Maison Blanche. In its comparable sales analysis, the tax court accepted Argote's comparable sales while rejecting certain non-local comparable sales submitted by Roddewig. Roddewig concluded that the luxury hotel market is national, rather than local, and thus included sales of comparable properties in other

American cities. *See Whitehouse Hotel*, 615 F.3d at 336. As discussed briefly above, the tax court once again rejected this theory on remand. *Whitehouse Hotel*, 139 T.C. at 329-30. The tax court did not simply reject the use of non-local comparable sales out-of-hand. It indicated that Argote, the Commissioner's expert, agreed with the concept of "look[ing] outside the location of the subject property for comparables." *Id.* at 329. The tax court did suggest that, in general, "proximity" to the subject property is "more probative of its value." *Id.* (quoting *Estate of Jameson v. Comm'r*, 267 F.3d 366, 373 (5th Cir. 2001)). The tax court specifically determined that Roddewig's adjusted values varied widely between local and non-local comparable sales. *Id.* at 329-30. Though our remand raised questions about the tax court's dismissal of Roddewig's non-local comparable sales, especially in light of the tax court's original lack of sufficient clarity about the highest and best use of the Maison Blanche, we did not preclude a finding that the use of non-local comparable sales was unnecessary here. The tax court did not err in rejecting the reproduction cost and income valuation methods, nor did it when rejecting Roddewig's non-local comparable sales.

## IV.    *Gross Undervaluation Penalty and the Good Faith Defense*

We have earlier noted that the tax court rejected Whitehouse's claim of entitlement to a good faith defense and affirmed the Commissioner's assessment of a 40% gross undervaluation penalty. This court in our 2010 opinion declined to rule on Whitehouse's good faith exception defense because of our remand for revaluation. Today we uphold the tax court's valuation. We are now left with the applicability of Whitehouse's good faith defense.

The legal question of "what elements must be present to constitute reasonable cause" is reviewed *de novo*. *Whitehouse Hotel*, 615 F.3d at 341 (quotation marks omitted). We review for clear error whether those elements

were actually proven. *Id.* Since the tax court's revised valuation also resulted in application of the gross undervaluation misstatement, the tax court reconsidered whether Whitehouse qualified for the good faith exception. The exception requires basing the claimed deduction on a qualified appraisal and, in addition, making a good faith investigation of the easement's value. *See* I.R.C. § 6664(c)(3)(A)-(B).

When Whitehouse filed its 1997 tax return, it had two appraisals of the Maison Blanche: the Cohen appraisal later relied upon by Roddewig and one done by REVAC, a company that at the time was a limited partner in the partnership. Whitehouse presented the testimony of Robert Drawbridge as to the partnership's reliance on the appraisals, its legal and accounting advisors, and its investigation of the value of the easement. It relied upon the Cohen appraisal generally, but commissioned the REVAC appraisal to use "as a check against the Cohen appraisal." The tax court reconsidered Drawbridge's testimony on remand regarding the appraisals and the investigations in conjunction with the guidance provided by this court.

The tax court began by apparently rejecting the Cohen appraisal, suggesting essentially that Cohen's valuation was so much larger than the price Whitehouse actually paid for the parcel that "a reasonably prudent taxpayer . . . [should have concluded] . . . that further investigation of the servitude's value was warranted." *Whitehouse Hotel*, 139 T.C. at 354.[12] Nonetheless, the Commissioner concedes in its brief that the appraisal was qualified for the purposes of the good faith exception. The tax court also apparently rejected the REVAC appraisal because it was only an appraisal of

---

[12] Cohen had appraised the Maison Blanche as having a pre-easement value of $96,000,000 and a post-easement value of $88,555,000. *Whitehouse Hotel*, 139 T.C. at 353. Like the tax court, we find the difference between the amount the partnership originally paid ($8,978,813) and the appraisal rather remarkable after less than three years of appreciation. *Id.* at 353-54.

the Maison Blanche and not of the servitude, a fact Whitehouse conceded, and Whitehouse "did not rely on it to value the servitude." *Id.* at 356. We do not accept the tax court's analysis, given that all parties seemingly agree that the easement is valued only by reference to pre- and post-easement appraisals of the entire parcel. The tax court also relied on Income Tax Reg. 1.6664-4(b)(1) (1997), which states that there must be more than the existence of an appraisal, but that the appraisal itself must be reliable. *Id.* at 354. We will not discuss any further what the tax court may have been saying about the appraisal, as the Commissioner does not argue that the appraisal should be rejected. As the tax court itself noted, the issue of whether a qualified appraisal existed had been conceded. *Id.* at 350.

The tax court further concluded, in both opinions, that Drawbridge had no personal knowledge of any investigation the partnership made into the valuation of the easement beyond reliance on the Cohen appraisal and consultation with attorneys and accountants. *Id.* at 350-51. We earlier questioned the tax court's skepticism of Drawbridge's testimony. *See Whitehouse Hotel*, 615 F.3d at 342. Though we described the tax court's analysis of the testimony as treating the matter as one of credibility, we stated that precedent permits a person to "testify to facts within the limited partnership's knowledge," regardless of whether that person had personal knowledge himself. *Id.* The tax court on remand, while acknowledging this instruction and permitting Drawbridge to testify to matters within the partnership's knowledge, still rested its conclusion in part on the fact that Drawbridge and Whitehouse did not present any direct evidence of their investigation into the value of the easement. *Whitehouse Hotel*, 139 T.C. at 357. Furthermore, it suggested Drawbridge's testimony provided no direct evidence as to what specific advice with respect to the easement Whitehouse received from its attorneys and accountants. *Id.* The tax court concluded that

absent such evidence, it could only hold that no good faith investigation was made into the valuation of the easement. *Id.* at 361-62.

Our instructions for the remand on this issue were described as guidance. *Whitehouse Hotel*, 615 F.3d at 343. The tax court concluded that more was required than a mere showing that Whitehouse relied on advice of attorneys and accountants when submitting the tax form containing the deduction for the easement. *Whitehouse Hotel*, 139 T.C. at 359-60. According to the tax court on remand, Whitehouse did not require the professionals to investigate the value of the easement and presumably had not done so. *Id.* at 360. Finally, it suggested that even though the professionals might have concluded that the Cohen appraisal was qualified for the purposes of the Section 1.170A-13(c)(2) deduction, the professionals did not investigate the value of the easement as required by Section 6664(c)(3)(B). *Id.*

Our review of the tax court's decision starts with the principle that "[w]hen an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for a taxpayer to rely on that advice." *United States v. Boyle*, 469 U.S. 241, 251 (1985). "Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney." *Id.* at 251. The Court held, though, that the relevant issue in that case of meeting filing deadlines was not an area in which tax experts were necessary. *Id.* at 251-52. Our earlier opinion cited *Boyle* for the tax court to consider on remand. *Whitehouse Hotel*, 615 F.3d at 343.

Different facts in these reliance-on-advice cases certainly can lead to different results. "We determine whether a taxpayer acted with reasonable cause on a case-by-case basis, evaluating the totality of the facts and circumstances." *Southgate Master Fund, L.L.C. ex rel. Montgomery Capital Advisors, LLC v. United States*, 659 F.3d 466, 493 (5th Cir. 2011). In *Montgomery Capital*, we analyzed the general "reasonable cause" defense,

holding that "reliance on the advice of a tax professional can, but does not necessarily demonstrate reasonable cause." *Id.* (quotation marks and citation omitted). Nonetheless, the statute requires a "good faith investigation" for donations of charitable property. I.R.C. § 6664(c)(3)(B). In sum, reasonable reliance on the word of qualified tax professionals suffices for the general reasonable cause exception. *Montgomery Capital,* 659 F.3d at 493. We left open the question of whether Whitehouse's reliance on tax professionals was enough. We now answer the question in the affirmative.

Whitehouse argues the good faith exception should apply because it sought out and then followed the advice of tax professionals and also sought a second appraisal of the building. Whitehouse argues this satisfies the obligation to make a good faith investigation into the value of the easement beyond the appraisal under Section 6664(c)(3)(B). The Commissioner responds that simply having a tax return prepared by accountants and tax advice from tax lawyers does not suffice either as the taxpayer's investigation or as one by professionals on which the taxpayer may rely.

We conclude that the tax court imposed an excessively high standard of proof for actual reliance on the advice of competent tax professionals with respect to this statutory defense. The tax court concluded in its remand decision that "the record is bare of any evidence supporting" a conclusion that Whitehouse undertook any investigation of the amount of the deduction for the conveyance of the easement and presumed that the tax professionals also did not. *Whitehouse Hotel,* 139 T.C. at 361. We disagree.

Valuation of assets is a difficult task, even with the advice and counsel of accountants, consultants, and tax attorneys. It is even more complicated when, as here, the valuation is divorced from a negotiated transaction between buyer and seller. In most transactions, presumably, the final sale price is forged from competing interests. That dynamic makes the sale price a good

indicator of the fair market value of a given property.  Even then, that price may be altered up or down by idiosyncratic characteristics of the parties.  This is not the case here.  This easement was a gratuitous transfer; the PRC did not haggle over price and did not pay a final sale price.

We are particularly persuaded by Whitehouse's argument that the Commissioner, the Commissioner's expert, and the tax court all reached different conclusions.  The Commissioner originally permitted only $1.15 million as a deduction.  Argote valued the easement as worthless.  We share the tax court's and the Commissioner's skepticism of the dramatic appreciation of value between the roughly $8,000,000 purchase price of the Maison Blanche shell and the Cohen appraisal's $96,000,000 valuation.  What the taxpayer reasonably considered, though, even if not sustained by the tax court, is that its contract to transform the building into a Ritz-Carlton hotel had value.  As we were in our 2010 opinion, we are skeptical of the tax court's conclusion that following the advice of accountants and tax professionals was insufficient to meet the requirements of the good faith defense, especially in regard to such a complex task that involves so many uncertainties.

As we did in *Montgomery Capital* for the general reasonable cause exception, we review the "totality of the facts and circumstances." 659 F.3d at 493.  Whitehouse obtained a second appraisal as a "check" against the first one.  Drawbridge testified and presented the 1997 Form 1065 indicating it had been prepared by Whitehouse's financial auditors.  Obtaining a qualified appraisal, analyzing that appraisal, commissioning another appraisal, and submitting a professionally-prepared tax return is sufficient to show a good faith investigation as required by law. *See* I.R.C. § 6664(c)(3)(B).   The tax court's enforcement of the gross undervaluation penalty was clearly erroneous.

We AFFIRM the tax court's second valuation.  We VACATE the tax court's enforcement of the gross undervaluation penalty, concluding the tax

court clearly erred in applying it. This case is REMANDED for entry of judgment consistent with this opinion.