149 T.C. No. 1

UNITED STATES TAX COURT

RERI HOLDINGS I, LLC, JEFF BLAU, TAX MATTERS PARTNER, Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9324-08.                          Filed July 3, 2017.

        PS, a partnership, paid $2.95 million in March 2002 to acquire
a remainder interest in property. The agreement that created the
remainder interest provided covenants intended to preserve the value
of the subject property but also limited the remedy available to the
holder of the remainder interest for a breach of those covenants to
immediate possession of the property; in no event would the holder of
the corresponding term interest be liable for damages to the holder of
the remainder interest. On Aug. 27, 2003, PS assigned the remainder
interest to U, a university. On its 2003 Form 1065, U.S. Return of
Partnership Income, PS claimed a deduction under I.R.C. sec.
170(a)(1) of $33,019,000. The Form 8283, Noncash Charitable
Contributions, that PS attached to its return provides the date and
manner of its acquisition of the contributed remainder interest but left
blank the space for the "Donor's cost or other adjusted basis".

        Held: PS' omission from its Form 8283 of its cost or other
adjusted basis in the contributed remainder interest violated the

substantiation requirement of sec. 1.170A-13(c)(4)(ii)(E), Income Tax Regs.

Held, further, because PS' disclosure of its cost or other basis in the contributed property would have alerted R to a potential overvaluation of that property, omission of that information prevented the Form 8283 from achieving its intended purpose; the omission thus cannot be excused on the grounds of substantial compliance.

Held, further, PS' failure to comply, either strictly or substantially, with the requirements of sec. 1.170A-13(c)(2), Income Tax Regs., requires denial in full of its claimed charitable contribution deduction.

Held, further, because of the limitation on remedies available to the holder of the remainder interest for breaches of protective covenants, the agreement that created that interest did not provide adequate protection to its holder, for purposes of sec. 1.7520-3(b)(2)(iii), Income Tax Regs.; the standard actuarial factors provided under I.R.C. sec. 7520 thus do not apply in valuing the remainder interest; instead, the value of that interest is its "actual fair market value", determined without regard to I.R.C. sec. 7520, on the basis of all of the facts and circumstances.  Sec. 1.7520-3(b)(1)(iii), Income Tax Regs.

Held, further, on the basis of all of the facts and circumstances, the remainder interest that PS assigned to U on Aug. 27, 2003, had a fair market value on that date of $3,462,886.

Held, further, because the $33,019,000 value that PS assigned to the remainder interest it transferred to U is more than 400% of that interest's actual fair market value, PS' claimed charitable contribution deduction resulted in a gross valuation misstatement.  I.R.C. sec. 6662(e)(1)(A), (h)(2).

Held, further, any underpayment resulting from the disallowance of PS' claimed charitable contribution deduction would

be "attributable to" a gross valuation misstatement to the extent the underpayment relates to the disallowance of that portion of the deduction that exceeds $3,462,886.  AHG Invs., LLC v. Commissioner, 140 T.C. 73 (2013).  885 Inv. Co. v. Commissioner, 95 T.C. 156 (1990), overruled.

Held, further, PS did not make a good-faith investigation of the value of the property subject to the remainder interest and thus did not have reasonable cause for, or act in good faith with respect to, its claim of a charitable contribution deduction that resulted in a gross valuation misstatement.  I.R.C. sec. 6662(c)(2)(B).

Stephen D. Gardner, Kathleen M. Pakenham, Clint E. Massengill, Adriana M. Lofaro, and Michael J. Berkovits, for petitioner.

Travis Vance, III, Kristen I. Nygren, John M. Altman, Leon St. Laurent, William D. White, and Tatiana Belenkaya, for respondent.

HALPERN, Judge:  This case is before us for review of a notice of final partnership administrative adjustment (FPAA).  On its Form 1065, U.S. Return of Partnership Income, for tax year 2003, RERI Holdings I, LLC (RERI) claimed a charitable contribution deduction of $33,019,000[1] for the transfer of a noncash asset to the Regents of the University of Michigan (University).  The FPAA, dated March 26, 2008, reduced RERI's claimed charitable contribution deduction on the

_____

[1]We round all dollar amounts to the nearest dollar.

ground that the contributed property was worth only $3,900,000. The FPAA also determined that RERI's claimed deduction resulted in a "substantial valuation misstatement" within the meaning of section 6662(e)(1).[2] In an amendment to his answer, respondent asserted that RERI was not entitled to any deduction for its contribution because the transaction of which it was a part was a sham for tax purposes or lacked economic substance or, alternatively, that RERI's deduction should be limited to the amount, $1,940,000, that the University realized on its sale of the contributed property. In a second amendment to his answer, respondent asserted that RERI's claimed deduction resulted in a "gross valuation misstatement" within the meaning of section 6662(h)(2). In a petition filed April 21, 2008, petitioner assigns error to respondent's adjustment of RERI's claimed charitable contribution deduction and to his assertion of penalties.

## FINDINGS OF FACT

### The Hawthorne Property and the AT&T Lease

Intergate.LA II LLC (Intergate), the owner of land and a web hosting facility in Hawthorne, California (Hawthorne property), entered into an industrial lease agreement dated October 12, 2000, under which it leased the Hawthorne

---

[2]All section references are to the Internal Revenue Code in effect for 2003, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

property to AT&T Corp. (AT&T). The AT&T lease had an initial term of 15.5 years but provided AT&T with options to renew the lease for successive 5-year periods. The lease provided for fixed rents during the initial term at rates that increased from $13.50 per square foot per year to $19.60 per square foot per year. Because the Hawthorne property consists of 288,000 square feet, the scheduled annual rent under the AT&T lease ranged from $3,888,000 ($13.50 × 288,000) to $5,644,800 ($19.60 × 288,000). If AT&T were to renew the lease, the rent during each renewal period would equal the then-market rate for similar property, subject to a minimum of $14 per square foot per year.

Hawthorne's Acquisition of the Hawthorne Property

In July 2001, Red Sea Tech I, Inc. (Red Sea), entered into an agreement with Intergate to acquire the Hawthorne property. On February 4, 2002, Red Sea assigned to RS Hawthorne, LLC (Hawthorne), its right, title and interest in and to its contract with Intergate.

On February 7, 2002, Hawthorne acquired the Hawthorne property from Intergate, subject to the AT&T lease, for $42,350,000. Hawthorne financed its acquisition with a loan from BB&T Bank (BB&T) of $43,671,739.

The Bonz/REA Appraisal

In an appraisal dated August 30, 2001, prepared for BB&T in connection with its loan to finance Hawthorne's acquisition of the Hawthorne property, Bonz/REA, Inc. (Bonz/REA), concluded that the Hawthorne property was worth $47 million as of August 16, 2001.  Bonz/REA based its conclusion in part on a discounted cashflow analysis.

In making its cashflow projections, Bonz/REA used the scheduled rent provided in the AT&T lease through the end of its initial term.  Bonz/REA estimated that market monthly rent at the outset of the AT&T lease was $1.29 per square foot and applied a multiplier of 2.75% to project market rent forward. Thus, Bonz/REA estimated that, in the first year following the end of the initial term of the AT&T lease, market rent would be $1.94 per square foot.  Bonz/REA discounted its projected cashflows through the end of the initial lease term at a rate of 9.5% and discounted its projected cashflows for the first two years following the end of that term at 12%.  For the 17th and final year of its projections (the second year following the end of the initial lease term), Bonz/REA included in cashflow a reversion value determined by capitalizing its projected year 17 net operating income at 10.5%.  Bonz/REA's projected year 17 net operating income of $6,405,677 is the difference between projected gross income of $7,217,787 and

projected operating expenses of $812,110.  The projected gross income of $7,217,787 includes assumed expense reimbursements of $611,988.

Creation of the SMI

When Hawthorne acquired the Hawthorne property, RS Hawthorne Holdings, LLC (Holdings), was Hawthorne's sole member and Red Sea was the sole member of Holdings.  After Hawthorne acquired the property, under an assignment dated February 7, 2002 (Assignment), Red Sea assigned its member interest in Holdings to RJS Realty Corp. (RJS), subject to Red Sea's reservation of an estate for years with a scheduled expiration date of December 31, 2020.[3]  (For convenience, following the parties' lead, we will refer to the term of years interest in the sole member interest in Holdings created by the Assignment as the TOYS interest and the corresponding remainder interest as the successor member interest, or SMI.)

_____

[3]On brief, respondent disputes that Red Sea was the sole member of Holdings on February 7, 2002, and that Red Sea assigned to RJS a remainder interest in the sole member interest in Holdings.  Pointing to alleged discrepancies in documentation included in the record, respondent claims that a different entity owned the sole member interest in Holdings on that date and assigned a remainder interest to a different assignee.  Respondent's claims on brief conflict with his stipulation, based on the Assignment, that "Red Sea assigned its membership interest in Holdings subject to reservation of an estate for years to RJS on or about February 7, 2002".

A breach by Red Sea of conditions specified in the Assignment would have required its early forfeiture of the TOYS interest. One of the specified conditions required Red Sea to comply with the AT&T lease and the BB&T loan and to cause Holdings and Hawthorne to comply with those agreements. In addition, the Assignment generally prohibited Red Sea from causing or permitting Holdings or Hawthorne to incur material obligations. It prohibited Red Sea from causing or permitting any transfer of the Hawthorne property or the member interest in Hawthorne or the imposition of any lien or encumbrance on either. And it required Red Sea to take all reasonable actions necessary to prevent Holdings or Hawthorne from committing waste in respect of the Hawthorne property.

The Assignment provides that, in the event of breach by Red Sea or its successors, the recourse of RJS or its successors "shall be strictly limited to" the TOYS interest. It further provides: "In no event may any relief be granted that imposes on the owner from time to time of the * * * [TOYS interest] any personal liability, it being understood that any and all remedies for any breach of the provisions hereof shall be limited to such owner's right, title and interest in and to * * * [the TOYS interest]."[4]

---

[4]Soon after assigning the SMI to RJS, Red Sea contributed its retained TOYS interest to a partnership. The record provides no indication of subsequent

(continued...)

By its terms, the Assignment is governed by the law of New York. The Assignment does not purport to impose on the TOYS holder a fiduciary duty owed to the SMI holder.

RERI's Acquisition and Assignment of the SMI

RERI entered into an agreement with RJS dated as of March 22, 2002, that provided for RJS' sale of the SMI to RERI for $2,950,000. Recitals to that agreement state that Holdings continued to own 100% of the beneficial interest in Hawthorne and Hawthorne continued to own the Hawthorne property. In an assignment dated as of March 25, 2002, RJS assigned the SMI to RERI.

On August 27, 2003, RERI assigned the SMI to the University. In contrast to the agreement under which RERI acquired the SMI, its assignment of the SMI to the University does not include recitals to the effect that, on the date of the assignment, Holdings continued to own the sole member interest in Hawthorne and Hawthorne continued to own the Hawthorne property. Holdings' transfer of its interest in Hawthorne, however, or Hawthorne's transfer of the Hawthorne

---

[4](...continued)
transfers of the TOYS interest. While we have no reason to believe that assignees of the TOYS interest were not bound by the conditions provided in the Assignment, because of the exculpatory provision limiting remedies for breach of those conditions, the extent to which they were binding on the owner of the TOYS interest as of the date of RERI's gift of the SMI to the University is immaterial to our disposition of the case.

property would have (1) breached conditions provided in the Assignment that created the SMI, and (2) caused a merger of the TOYS interest and the SMI. Because RERI's assignment to the University identifies the transferred property as the SMI rather than a fee simple interest in the sole member interest in Holdings, it follows that, on that date of that assignment, Holdings continued to own the sole member interest in Hawthorne and Hawthorne continued to own the Hawthorne property. For the same reason, it follows that Holdings had no material liabilities on August 27, 2003, and Hawthorne had no material liabilities other than its obligation under the BB&T loan.

RERI's Substantiation of Its Claimed Charitable Contribution Deduction

In an appraisal prepared for RERI dated September 22, 2003, Howard C. Gelbtuch of Greenwich Realty Advisors, Inc., assigned a value of $55 million to the fee interest in the Hawthorne property as of August 28, 2003. Mr. Gelbtuch multiplied his estimate of the fee interest in the Hawthorne property by an actuarial factor purportedly provided in section 7520 to arrive at an "investment value" of the SMI. The deduction RERI claimed for its assignment of the SMI to the University equals the investment value determined by Mr. Gelbtuch increased by appraisal and professional fees.

The Form 8283 appraisal summary that RERI attached to its 2003 return indicates that it acquired the SMI by purchase on March 22, 2002. It shows no amount in the space provided for the "Donor's cost or other adjusted basis".[5]

Expert Testimony Regarding the SMI's Value

James Myers

Petitioner offered testimony of James W. Myers, an executive managing director at the valuation and advisory firm of Cushman & Wakefield Western, Inc. We accepted Mr. Myers as an expert on real estate valuation. Mr. Myers determined that the SMI had a market value as of August 27, 2003, of $16.55 million. Mr. Myers derived that value in two steps. First, he determined that the member interest in Holdings would be worth $101 million on January 1, 2021, when the SMI would become possessory. He then discounted that future value back to August 27, 2003, at a rate of 11%.

Mr. Myers derived his $101 million future value for the member interest in Holdings by combining the results of two slightly different approaches. First, he determined the value of projected post-2020 cashflows, as of January 1, 2021, to be $106.8 million. Next, he capitalized his estimate of net operating income from

[5]In May 2004, shortly after it filed its 2003 return, RERI filed with the Delaware secretary of state a certificate of cancellation.

the Hawthorne property for 2021, $8,156,618, at 8.5%, rounding the result to $96 million. The $101 million projected future value he selected for the member interest in Holdings as of January 1, 2021, is the approximate midpoint of the range established by the results he achieved by applying the discounted cashflow and direct capitalization methods.

The projected cashflows that Mr. Myers used in applying the discounted cashflow method to determine the value of the member interest in Holdings as of January 1, 2021, reflect his determination, based on an analysis of comparable properties, that market rent for the Hawthorne property as of August 27, 2003, was $1.50 per square foot per month.[6] Mr. Myers' projections for rental income from the Hawthorne property between 2021 and 2032 accrete at an assumed 3% growth rate his estimated August 2003 market rent. Mr. Myers' projected net cashflow of $8,107,588 for 2021 is the difference between his projected net operating income of $8,156,618 and an assumed $49,030 addition to capital reserves. In computing net operating income for periods after 2020, Mr. Myers included a deduction of 5% of potential gross revenue (that is, the sum of rental income and expense

---

[6]For purposes of comparison, the rent then provided for in the AT&T lease was $324,000 per month, or $1.125 per square foot. Respondent presented no evidence to refute Mr. Myers' determination that the rent provided in the AT&T lease was below market as of August 27, 2003.

reimbursements) as an estimate of losses due to vacancy or uncollectible rent. Thus, for example, Mr. Myers deducted $561,688 (5% of the sum of base rental revenue, $8,718,309, and reimbursable expenses, $2,515,454) for "Vacancy/Credit Loss" in computing 2021 net cashflow.[7]  Mr. Myers derived a terminal value in 2032, at the end of the period covered by his projections, by capitalizing the final period net operating income at a rate of 9%.

In discounting his projected post-2020 cashflow back to January 1, 2021, Mr. Myers applied the same 9% discount rate that he used in applying the discounted cashflow method to determine the fee value of the Hawthorne property as of August 27, 2003.  He derived his 9% discount rate from two components: (1) a 7.5% rate appropriate for "bondable leases" like the AT&T lease, which equals the 13-year corporate bond yield in September 2003 (roughly 6%) increased by a 1.5% "liquidity" premium, and (2) the average rate of return on real estate investments according to a survey, which trended between 10% and 10.5% during the relevant period.

---

[7]By contrast, in projecting net cashflow through 2014 for the purpose of determining the fee value of the Hawthorne property as of August 27, 2003, Mr. Myers assumed vacancy/credit losses of only 1% of potential gross revenue.

Mr. Myers determined that the Hawthorne property would have an estimated useful life of 65 years and an effective age of 38 years in 2021, when the SMI becomes possessory.

Richard Voith

Petitioner also offered testimony of Richard Voith, the president and founding principal of Econsult Solutions, Inc., an economic consulting firm. Dr. Voith has a Ph.D. in economics from the University of Pennsylvania. We accepted Dr. Voith as an expert in the subject matter (as described by petitioner's counsel) of "the economic determinants of value of a real estate asset and also in how the discount rates are determined in the course of making investment in real estate." In his report, Dr. Voith did not provide a definitive opinion regarding the SMI's value on August 27, 2003. Instead, Dr. Voith described general considerations relevant to determining that value that tended to support the approach taken by Mr. Myers and the result he reached. In particular, Dr. Voith presented an analysis that, in his words, "suggests that the RERI SMI should be valued at at least $16.5 million in 2003." But Dr. Voith based that conclusion on assumptions about rental income, growth rates, and discount rates. He did not state a conclusion, on the basis of his expert judgment, as to the validity of those assumptions.

<u>Michael Cragg</u>

Respondent offered testimony of Michael I. Cragg. Dr. Cragg, who has a Ph.D. in economics from Stanford University, is a principal and director of The Brattle Group, also an economic consulting firm. We accepted Dr. Cragg as an expert in finance, economics, and valuation. In his initial report, Dr. Cragg opined that the SMI was worth no more than $1.65 million in April 2002.

Dr. Cragg began his analysis by determining the present value of projected cashflow from the Hawthorne property through the end of the initial term of the AT&T lease in May 2016. In making his cashflow projections, Dr. Cragg relied on the Bonz/REA appraisal for his estimate of operating expenses. He discounted his projected cashflows through May 2016 at a rate of 7.92%, which he estimated to be AT&T's 14-year borrowing rate. Applying that rate to his projected cashflows through May 2016 produced a present value of $39.06 million.

Next, Dr. Cragg determined the present value of the post-May 2016 projected cashflows from the Hawthorne property by subtracting the present value of the cashflows through May 2016, $39.06 million, from the fee value of the Hawthorne property, which Dr. Cragg assumed to be $42.35 million--the price for which Hawthorne acquired the property in February 2002. Thus, Dr. Cragg

determined that post-May 2016 projected cashflows had a present value of $3.29 million ($42.35 million – $39.06 million).

Dr. Cragg then determined the portion of that $3.29 million present value attributable to projected cashflows between the end of the initial period of the AT&T lease and the scheduled termination date of the TOYS interest (December 31, 2020). In making that determination, Dr. Cragg first projected cashflows from the Hawthorne property after the termination of the AT&T lease. To do so, he assumed that rental income in periods after the termination of the initial lease term would equal the scheduled rent as of the end of the initial term increased by an assumed growth rate of 3.29%, which he derived from an index of U.S. commercial real estate prices.[8] Dr. Cragg then solved algebraically for the rate that would discount his projected post-May 2016 cashflows (including a capitalized terminal value) to a present value of $3.29 million. That rate, his calculations showed, is 18.99%. Applying that rate to projected cashflows after December 31, 2020, produced a value for the SMI of $1.65 million.

Dr. Cragg's use of significantly different discount rates to determine the present value of projected cashflows before and after the expiration of the initial

---

[8] Dr. Cragg's projected annual cashflows range from $3,350,215 for 2016 to $6,451,084 for 2020.

term of the AT&T lease resulted in a pronounced "cliff effect". For example, Dr. Cragg assumed cashflow of $463,344 for the month of May 2016, which he determined to have a present value, discounted at 7.92%, of $158,352. By contrast, a larger assumed monthly cashflow for June 2016, $478,602, had a present value, discounted at 18.99%, of only $40,780.

Dr. Cragg's initial analysis used a valuation date of April 2002 because he prepared that analysis primarily to support respondent's argument that RERI's acquisition and assignment of the SMI lacked economic substance. Dr. Cragg sought to show that the prices at which the SMI changed hands did not reflect its true value. He did not initially focus his analysis on the date RERI contributed the SMI to the University. When respondent moved at trial to introduce Dr. Cragg's report into evidence, petitioner objected on relevance grounds, reminding us of our conclusion in an earlier report on this case that "gifts to charity need have no economic substance beyond the mere fact of the gift". RERI Holdings I, LLC v. Commissioner, T.C. Memo. 2014-99, at *22. To address petitioner's objection, the parties agreed to redact those portions of Dr. Cragg's report that address issues of economic substance and business purpose. We accepted the redacted report into evidence.

In a rebuttal report, Dr. Cragg indicated that the analysis presented in his original report would imply a value for the SMI of $2.09 million as of August 31, 2003. That figure appears to be the present value of Dr. Cragg's projected post-2020 cashflows discounted at 18.99% back to August 31, 2003, instead of his initial valuation date of April 1, 2002.

Dr. Cragg's rebuttal report includes a pair of tables that compare his analysis to that of Dr. Voith. Under the heading "Cragg Report", each table states a "Value of the Remainder Estate * * * As of January 31, 2021" of $42.46 million. As explained in the more detailed of the two tables, that figure equals Dr. Cragg's projected cashflow for 2021 ($6.45 million × 1.0329, or $6.66 million) capitalized at a rate equal to the excess of his discount rate for post-May 2016 cashflows over his assumed growth rate (.1899 – .0329, or .157).

<u>Mel Abraham</u>

Respondent also offered testimony of valuation and litigation consultant Mel H. Abraham. Mr. Abraham has a degree in accounting and holds various certifications related to valuation and appraisal. We accepted Mr. Abraham as an expert in business valuation.

Mr. Abraham determined that the SMI was worth $3,382,000 as of August 27, 2003. That amount is the weighted average of the present value of the post-

2020 cashflows Mr. Abraham projected in five alternative "scenarios" reduced by a 10% discount for lack of liquidity. In determining the present value of his projected cashflow in each scenario, Mr. Abraham applied a discount rate of 18%, which he derived by starting with an assumed risk-free rate and adding premiums attributable to equity investments in relatively small entities. Mr. Abraham's alternative scenarios rest on differing assumptions about AT&T's exercise of its renewal options in its lease of the Hawthorne property. In his scenario 1, Mr. Abraham assumed that AT&T would decline to exercise any of its renewal options, resulting in the expiration of the AT&T lease in May 2016. In scenarios 2, 3, and 4, Mr. Abraham assumed that AT&T would elect to extend the lease for renewal periods of 5, 10, and 15 years, respectively. Finally, in his scenario 5, Mr. Abraham projected cashflows through the scheduled termination of the TOYS interest in May 2020. At the end of the period covered by each series of projections, Mr. Abraham capitalized his projected final period cashflow at a rate of 10.5%. In choosing his capitalization rate, Mr. Abraham relied on the Bonz/REA appraisal.

Mr. Abraham also relied on the Bonz/REA appraisal for his projections of rental income for periods after the expiration of the initial term of the AT&T lease. In particular, Mr. Abraham accepted Bonz/REA's estimate that market rent for the

Hawthorne property would be $1.94 per square foot per month in 2017. For periods after 2017, Mr. Abraham purported to follow the Bonz/REA appraisal in applying a growth rate of 3%,[9] but his figures actually reflect a growth rate of only 2.5%.

Mr. Abraham also purported to rely on the Bonz/REA appraisal for his projection of expenses after the initial term of the AT&T lease. For 2017 and subsequent years, Mr. Abraham projected expenses equal to 11% of his projected annual rental income. Mr. Abraham described his assumption of expenses equal to 11% of rental revenue as "based upon the amount used in the Bonz reversion calculation."[10]

On the basis of the assumptions described above, Mr. Abraham projected net cashflow from the Hawthorne property for 2021, the year the SMI would become possessory, of $6,586,595 ($1.94 monthly rent per square foot in 2017 ×

---

[9]The 3% figure to which Mr. Abraham referred in his report reflects a rounding of the 2.75% growth rate that Bonz/REA actually applied in making its cashflow projections.

[10]While Bonz/REA's projected operating expenses of $812,110 for year 17 of the period covered by its projections are about 11.25% of its projected gross income of $7,217,787, as noted supra pp. 6-7, Bonz/REA's projected gross income includes assumed expense reimbursements of $611,988. Bonz/REA's projected unreimbursable expenses for year 17 of $200,122 ($812,110 – $611,988) are just under 3% of its projected gross rental income of $6,697,164.

288,000 square feet $\times$ 12 months $\times$ 1.025$^4$ multiplier for growth between 2017 and 2021 $\times$ .89 inverse of assumed expense ratio).

## OPINION

I.  Jurisdiction To Determine Partnership Items and Related Penalties

Because RERI's tax matters partner filed a petition for readjustment of partnership items with this Court within 90 days of the date of respondent's FPAA, section 6226(f) grants us jurisdiction to determine all of RERI's "partnership items" for 2003 and the proper allocation of those items among its partners. Section 6231(a)(3) defines partnership item: "The term 'partnership item' means, with respect to a partnership, any item required to be taken into account for the partnership's taxable year under any provision of subtitle A [sections 1-1563] to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level." Section 301.6231(a)(3)-1(a)(1)(i), Proced. & Admin. Regs., provides that partnership items include the partnership aggregate and each partner's share of items of income, gain, loss, deduction or credit of the partnership. Thus, the charitable contribution deduction RERI claimed on its 2003 Form 1065 is a partnership item that is subject to determination in this partnership-level proceeding.

Section 6226(f) also grants us jurisdiction to determine "the applicability of any penalty * * * which relates to an adjustment to a partnership item." Thus, we have jurisdiction to determine the applicability of the substantial or gross valuation misstatement penalty of section 6662(e)(1) or (h)(2) as a result of the disallowance of all or part of RERI's claimed charitable contribution deduction.

## II. The Deductibility of RERI's Charitable Contribution

### A. Applicable Substantiation Rules

Section 170(a)(1) allows a deduction for "any charitable contribution * * * made within the taxable year * * * only if verified under regulations prescribed by the Secretary." The amount of a contribution of property other than money is generally measured by the property's fair market value at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs.

In the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, sec. 155(a)(1) and (2), 98 Stat. at 691, Congress directed the Secretary to prescribe regulations under section 170(a)(1) requiring donors to meet heightened substantiation requirements to support deductions claimed for charitable contributions. Congress intended the new substantiation requirements to alert the Commissioner to potential overvaluations of contributed property and thus deter taxpayers from claiming excessive deductions. The Senate Finance Committee,

which first proposed strengthening the substantiation requirements for charitable contributions, noted the difficulty of "detect[ing] all or even most instances of excess contributions." S. Prt. No. 98-169 (Vol. 1), at 444 (S. Comm. Print 1984). The committee expressed concerns about taxpayers "continu[ing] to play the 'audit lottery'". Id. Similarly, the Staff of the Joint Committee on Taxation, in its General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 (1984 Blue Book), at 504 (J. Comm. Print 1984), observed: "[I]t is not possible to detect all or even most instances of excessive deductions by relying solely on the audit process. Because valuation of some types of property cannot be determined by reference to readily available and accepted valuation tables, taxpayers may continue to play the 'audit lottery' and claim excessive charitable deductions."

In response to DEFRA's directive, the Secretary amended section 1.170A-13, Income Tax Regs., by, among other things, adding paragraph (c), which provides substantiation requirements that apply to charitable contributions made after December 31, 1984, by specified donors, including partnerships, of property worth more than $5,000. T.D. 8199, 1988-1 C.B. 99. Failure to satisfy those requirements results in denial of a deduction for the contribution under section 170. Sec. 1.170A-13(c)(1)(i), Income Tax Regs. To meet the requirements, the

donor must obtain a qualified appraisal of the contributed property, attach a "fully completed" appraisal summary to the return on which the deduction is first claimed, and maintain records containing specified information. See sec. 1.170A-13(c)(2)(i)(A), (B), and (C), Income Tax Regs. The required appraisal summary must provide, among other things, the adjusted cost or other basis of the donated property. Sec. 1.170A-13(c)(4)(ii)(E), Income Tax Regs.

B.    Substantial Compliance

In Bond v. Commissioner, 100 T.C. 32, 40-41 (1993), we determined that the reporting requirements of section 1.170A-13, Income Tax Regs., are "directory and not mandatory", so that a failure to comply strictly with those requirements can be excused if the donor demonstrates "substantial compliance". The taxpayers in that case attached to the return on which they claimed the deduction in issue an appraisal summary on Form 8283 that included all of the required information other than the appraiser's qualifications, which "were promptly furnished to respondent's agent at or near the commencement of his audit" of their return. Id. at 42. We reasoned: "The denial of a charitable contribution deduction under these circumstances would constitute a sanction which is not warranted or justified." Id. We thus concluded that the taxpayers had substantially complied with section 1.170-13A, Income Tax Regs., and were entitled to the claimed deduction.

By contrast, in Hewitt v. Commissioner, 109 T.C. 258 (1997), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998), the taxpayers neither obtained a qualified appraisal of the nonpublicly traded stock they donated nor attached an appraisal summary to their return.  The Commissioner disallowed the taxpayers' claimed deduction even though she did not dispute that the deducted amount equaled the stock's value.  We rejected the taxpayers' argument that they had substantially complied with the substantiation requirements.  "Given the statutory language [requiring a qualified appraisal] and the thrust of the concerns about the need of respondent to be provided with appropriate information in order to alert respondent to potential overvaluations", we wrote, "petitioners simply do not fall within the permissible boundaries of Bond".  Id. at 264; see also Alli v. Commissioner, T.C. Memo. 2014-15, at *52 ("In determining whether a taxpayer has substantially complied with the charitable reporting regulations, we return to the purpose of the regulations[.]").

In Smith v. Commissioner, T.C. Memo. 2007-368, 2007 WL 4410771, at *19, aff'd, 364 F. App'x 317 (9th Cir. 2009), we derived from Bond and Hewitt a standard for determining substantial compliance under which we "consider whether * * * [the donor] provided sufficient information to permit * * * [the Commissioner] to evaluate the[] reported contributions, as intended by Congress."

C.    RERI's Failure To Substantiate Its Claimed Deduction

The Form 8283 appraisal summary that RERI attached to its 2003 return indicates that it acquired the SMI by purchase on March 22, 2002, but shows no amount in the space provided for the "Donor's cost or other adjusted basis".  Thus, RERI's Form 8283 did not satisfy the requirement of section 1.170A-13(c)(4)(ii)(E), Income Tax Regs.

Moreover, because RERI's omission of its basis in the SMI from the Form 8283 it attached to its 2003 return prevented the appraisal summary from achieving its intended purpose, RERI's failure to meet the requirement of section 1.170A-13(c)(4)(ii)(E), Income Tax Regs., cannot be excused by substantial compliance.  As explained above, Congress directed the Secretary to adopt stricter substantiation requirements for charitable contributions to alert the Commissioner, in advance of audit, of potential overvaluations of contributed property and thereby deter taxpayers from claiming excessive deductions in the hope that they would not be audited.  S. Prt. No. 98-169 (Vol. 1), supra at 444; 1984 Blue Book, supra at 503-504; see also Hewitt v. Commissioner, 109 T.C. at 264.  RERI acquired the SMI for about $3 million in March 2002 and claimed a charitable contribution deduction of about $33 million for its assignment of the SMI to the University in August 2003.  The significant disparity between the claimed fair

market value and the price RERI paid to acquire the SMI just 17 months before it assigned the SMI to the University, had it been disclosed, would have alerted respondent to a potential overvaluation of the SMI.[11]  Because RERI failed to provide sufficient information on its Form 8283 to permit respondent to evaluate its reported contribution, cf. Smith v. Commissioner, 2007 WL 4410771, at *19, we cannot excuse on substantial compliance grounds RERI's omission from that form of its basis in the SMI.  Therefore, RERI did not "[a]ttach a fully completed appraisal summary" to its 2003 return as required by section 1.170A-13(c)(2)(i)(B), Income Tax Regs.  Because RERI did not meet the substantiation requirements provided in section 1.170A-13(c)(2), Income Tax Regs., it is not

---

[11]In some cases, the donor's basis in the contributed property could "affect[] the amount of the deduction allowed" and thus would be "essential" information. See Alli v. Commissioner, T.C. Memo. 2014-15, at *43.  Sec. 170(e)(1)(A) requires that the amount of a charitable contribution deduction otherwise allowed by sec. 170 be reduced by "the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution)".  However, because RERI had held the SMI for more than one year when it contributed the SMI to the University, any gain the partnership would have recognized had it sold the SMI on the date of the gift would have been long-term capital gain.  See sec. 1222(3).

entitled to any deduction under section 170 for its contribution of the SMI to the University. See sec. 170(a)(1); sec. 1.170A-13(c)(1), Income Tax Regs.[12]

III. Penalties

As noted at the outset, the FPAA determined that the charitable contribution deduction that RERI claimed for its assignment of the SMI to the University resulted in a "substantial valuation misstatement" within the meaning of section 6662(e)(1). In addition, in an amendment to his answer, respondent asserted that RERI's claimed deduction resulted in a "gross valuation misstatement" within the meaning of section 6662(h)(2).

---

[12]Because we conclude that RERI's failure to comply with the substantiation requirements of sec. 1.170A-13(c)(2), Income Tax Regs., justifies the full disallowance of its claimed deduction, we need not consider the other arguments respondent made to disallow that deduction in its entirety, including his claim that RERI's acquisition and assignment of the SMI lacked economic substance and should be disregarded and his questions about the legal validity and enforceability of the SMI and Red Sea's ownership of the sole member interest in Holdings (and thus its ability to transfer any recognized rights to RERI). In addition, because we conclude that RERI did not attach to its 2003 return a "fully completed" appraisal summary, as required by sec. 1.170A-13(c)(2)(i)(B), Income Tax Regs., we need not address respondent's argument that the Gelbtuch appraisal was not a qualified appraisal within the meaning of sec. 1.170A-13(c)(3)(i), Income Tax Regs.

A.    Background

        1.    The Accuracy-Related Penalties for Valuation Misstatements

Section 6662(a) and (b)(3) imposes an accuracy-related penalty if any part

of an underpayment of tax required to be shown on a return is due to a substantial

valuation misstatement.  The penalty is 20% of the portion of the underpayment of

tax to which the section applies.  Sec. 6662(a).  In the case of a gross valuation

misstatement, the penalty rate is increased from 20% to 40%.  Sec. 6662(h)(1).

The substantial valuation misstatement penalty applies to any portion of an

underpayment that is attributable to the taxpayer's claiming on a return a value or

basis of property that is 200% or more of the correct value or basis.  Sec.

6662(e)(1).  The gross valuation misstatement penalty applies if the claimed value

or basis is 400% or more of the correct amount.  Sec. 6662(h)(2).  The penalty for

a valuation misstatement does not apply, however, unless the portion of a

taxpayer's underpayment for a taxable year attributable to either a substantial or a

gross valuation misstatement exceeds $5,000 (or, in the case of most corporations,

$10,000).  Sec. 6662(e)(2).

    In the case of a partnership or other "pass-through entity", "[t]he

determination of whether there is a substantial or gross valuation misstatement

\* \* \* is made at the entity level."  Sec. 1.6662-5(h)(1), Income Tax Regs.; <u>see also</u> sec. 1.6662-4(f)(5), Income Tax Regs. (defining "pass-through entity").  The dollar limitation provided by section 6662(e)(2), however, is applied at the partner level. Sec. 1.6662-5(h)(1), Income Tax Regs.

Section 6664(c) provides an exception to the accuracy-related (and fraud) penalties if there was reasonable cause for the portion of the underpayment subject to the penalty and the taxpayer acted with good faith with respect to that portion. Under section 6664(c)(2), however, the reasonable cause exception does not apply to a substantial or gross valuation misstatement arising from a claimed charitable contribution deduction unless "(A) the claimed value of the property was based on a qualified appraisal made by a qualified appraiser, and (B) in addition to obtaining such appraisal, the taxpayer made a good faith investigation of the value of the contributed property."

### 2. Scope of Jurisdiction To Determine Penalties and Defenses

As noted at the outset, section 6226(f) grants us jurisdiction in this partnership-level proceeding to determine the applicability of any penalty "related to" the disallowance of RERI's claimed charitable contribution deduction.  In our exercise of that jurisdiction, we must make "all the legal and factual determinations that underlie the determination of \* \* \* [the] penalty \* \* \* other

than partner-level defenses". Sec. 301.6221-1(c), Proced. & Admin. Regs. In particular, the determination of whether the disallowance of RERI's deduction results in a substantial or gross valuation misstatement must be made at the partnership level. E.g., Stobie Creek Invs., LLC v. United States, 82 Fed. Cl. 636, 704 (2008) ("[T]he determination of whether a substantial or gross valuation misstatement exists is made at the entity level[.]"), aff'd, 608 F.3d 1366 (Fed. Cir. 2010).

As noted above, however, our jurisdiction does not extend to the evaluation of "partner-level defenses", which are "those that are personal to the partner or are dependent upon the partner's separate return and cannot be determined at the partnership level." Sec. 301.6221-1(d), Proced. & Admin. Regs. Although the regulations list the reasonable cause exception of section 6664(c)(1) as an example of a partner-level defense, id., they do not foreclose the possibility that a partnership may have its own reasonable cause defense. Thus, this Court and others have considered reasonable cause defenses in partnership-level proceedings when those defenses are based on facts and circumstances common to all partners, such as the reliance of a partnership's managing partner on the advice of counsel. E.g., Stobie Creek, 608 F.3d at 1380-1381; Am. Boat Co. v. United States, 583 F.3d 471, 479-480 (7th Cir. 2009); Tigers Eye Trading, LLC v. Commissioner,

T.C. Memo. 2009-121, 2009 WL 1475159, at *18; Santa Monica Pictures, LLC v. Commissioner, T.C. Memo. 2005-104, 2005 WL 1111792, at *101-*112.

In the case of a valuation misstatement penalty arising from the disallowance of all or part of a partnership's claimed charitable contribution deduction, however, the availability of a reasonable cause defense can be considered only at the partnership level. As noted above, in that circumstance, the reasonable cause exception does not apply unless the partnership's deduction is supported by both a qualified appraisal and a good-faith investigation into the value of the contributed property. Sec. 6664(c)(2). And satisfaction of the conditions specified in section 6664(c)(2) "are partnership-level determinations". Whitehouse Hotel Ltd. P'ship v. Commissioner, 131 T.C. 112, 173 (2008), vacated on other grounds, 615 F.3d 321 (5th Cir. 2010). The good-faith investigation required by section 6664(c)(2)(B) must be made by a person with authority to "act[] on behalf of the partnership". Whitehouse Hotel Ltd. P'ship v. Commissioner, 139 T.C. 304, 351 (2012), aff'd in part, vacated in part, 755 F.3d 236 (5th Cir. 2014).

3.      Burden of Proof

Rule 142(a) provides:  "The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer, it shall be upon the respondent."  In regard to penalties, the Commissioner bears the burden of production.  See sec. 7491(c).  To meet that burden, he must produce evidence regarding the appropriateness of imposing the penalty.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once the Commissioner satisfies his burden of production, the taxpayer generally has the burden of proof with respect to exculpatory factors such as reasonable cause. See id. at 446-447.

We must first determine whether respondent satisfied the burden of production imposed on him by section 7491(c) by producing evidence regarding the appropriateness of either the substantial or gross valuation misstatement penalty.  If so, we must then consider whether any partnership-level defenses such as reasonable cause prevent the application of either penalty.

B.  Whether Any Underpayment Resulting From the Disallowance of RERI's Claimed Deduction Could Be "Attributable To" a Gross or Substantial Valuation Misstatement

We begin by considering whether any underpayment resulting from our disallowance of RERI's claimed charitable contribution would be "attributable to" a gross or substantial valuation misstatement even though that disallowance results not from RERI's claiming a value for the SMI in excess of its correct value but instead from the partnership's failure to substantiate its claimed deduction in accordance with section 1.170A-13(c)(2), Income Tax Regs.  We conclude that, if a taxpayer claims a deduction that overstates by 200% or 400% the value or basis of property, any underpayment resulting from the disallowance of that deduction on grounds unrelated to valuation is nonetheless "attributable to" the valuation misstatement, within the meaning of section 6662(b)(3) and (h)(1), to the extent that the underpayment relates to the disallowance of that portion of the deduction that exceeds the property's correct value or basis.  AHG Invs., LLC v. Commissioner, 140 T.C. 73 (2013).

In Todd v. Commissioner, 89 T.C. 912 (1987), aff'd, 862 F.2d 540 (5th Cir. 1988), we concluded that valuation misstatement penalties do not apply to a taxpayer who overstates the value or basis of property if the taxpayer's underpayment results not from that misvaluation but instead from the complete

disallowance of the taxpayer's claimed deductions or credits on grounds unrelated to valuation.  Todd involved taxpayers who had participated in a marketed tax shelter.  Participating taxpayers had claimed depreciation deductions and investment tax credits in respect of property in which they claimed a basis of $260,000 per unit.  In a prior test case, we had determined that the basis of each unit did not exceed $60,000.  Noonan v. Commissioner, T.C. Memo. 1986-449, 1986 Tax Ct. Memo LEXIS 158, at *75-*76, aff'd sub nom. Hillendahl v. Commissioner, 976 F.2d 737 (9th Cir. 1992).  The basis claimed by participating taxpayers thus resulted in a valuation overstatement for purposes of section 6659 of prior law.  The deductions and credits claimed by the Todd taxpayers, however, were disallowed because their property had not been placed in service until after the year in issue.  Therefore, we held that the underpayment of those taxpayers was not "attributable to the valuation overstatement".  Todd v. Commissioner, 89 T.C. at 916.  Congress had enacted section 6659 to enable us to reduce our caseload.  The Commissioner's interpretation of that section, we reasoned, would require us to determine the existence of a valuation overstatement even when we chose to determine the taxpayer's underlying tax liability on other grounds.  "Such a requirement", we wrote, "would prolong and multiply litigation, is contrary to

sound judicial administration, and appears contrary to congressional intent to reduce our case load." Id. at 920.

In McCrary v. Commissioner, 92 T.C. 827, 854 (1989), we extended the Todd rationale to a case in which the taxpayers sought to avoid the valuation overstatement penalty resulting from a disallowance of claimed investment tax credits by conceding that they were not entitled to the credits in issue for reasons unrelated to the value of the property.

In 885 Inv. Co. v. Commissioner, 95 T.C. 156 (1990), we held that taxpayers were not liable for the valuation overstatement penalty provided in section 6659 because we disallowed their claimed charitable contribution deduction entirely on the ground that their gift was subject to a condition. Because the disallowance was not the result of a valuation overstatement, we concluded, relying on both Todd and McCrary, that the penalty did not apply. If 885 Inv. Co. remains reliable precedent, it supports a determination in the present case that any underpayment resulting from our disallowance of RERI's claimed charitable contribution would not be "attributable to" a gross or substantial valuation misstatement. In AHG Invs., LLC v. Commissioner, 140 T.C. at 83, however, we overruled both Todd and McCrary. Because of our overruling of the

two cases on which we relied in <u>885 Inv. Co.</u>, we will no longer follow that case. Instead, we view <u>885 Inv. Co.</u> as having been overruled, sub silencio, by <u>AHG.</u>

<u>AHG</u> involved a partner who had been allocated a share of partnership loss that the Commissioner disallowed in an FPAA.  The taxpayer in <u>AHG</u> conceded that he was not entitled to the disallowed loss because he was not at risk under section 465 and the partnership's allocation to him of a share in the loss did not have substantial economic effect within the meaning of section 704(b)(2).  The taxpayer made this concession, we found, "in an attempt to avoid application of the 40% gross valuation misstatement penalty".  <u>AHG Invs., LLC v. Commissioner</u>, 140 T.C. at 73.  The taxpayer moved for partial summary judgment that the valuation misstatement penalty did not apply as a matter of law because the disallowance of the loss in issue rested on grounds unrelated to valuation or basis.  We denied the taxpayer's motion and ruled "that a taxpayer may not avoid the gross valuation misstatement penalty merely by conceding a deduction or credit on a ground unrelated to value or basis of property." <u>Id.</u> at 75-76.

Our conclusion in <u>AHG</u> squarely conflicted with our prior Opinion in <u>McCrary</u>.  We resolved that conflict by overruling <u>McCrary</u>. <u>Id.</u> at 83.

Overruling <u>McCrary</u> did not require overruling <u>Todd</u> as well.  We could have distinguished cases in which a taxpayer attempts to avoid a valuation

misstatement penalty by means of a selective concession on possibly spurious grounds from those in which we ourselves determine that valid alternative grounds require the denial of a claimed tax benefit.  But in AHG we declined to draw that distinction, finding that the Commissioner had "met his burden to persuade us to overrule our precedent established by Todd * * * and McCrary."  Id.  Although our precise holding in AHG related to taxpayer concessions and thus does not conflict with Todd, we grounded our holding in AHG on a broader principle that "an underpayment of tax may be attributable to a valuation misstatement even when the Commissioner's determination of an underpayment of tax may also be sustained on a ground unrelated to basis or valuation."  Id. at 84.  Our adoption of that principle required us to overrule Todd and also requires that we overrule 885 Inv. Co.

An argument grounded in the Todd rationale may remain viable in the Courts of Appeals for the Fifth and Ninth Circuits.  The Court of Appeals for the Fifth Circuit not only affirmed our decision in Todd; it also extended the Todd rationale to a case involving losses and credits disallowed on economic substance grounds, even though the economic substance analysis depended in part on the overvaluation of the property in respect of which the losses and credits were claimed.  See Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), rev'g T.C.

Memo. 1988-408.  More recently, in Bemont Invs., L.L.C. v. United States, 679 F.3d 339 (5th Cir. 2012), the court expressed reservations about the rationale of Todd and Heasley but nonetheless followed those cases under stare decisis.  (In a separate concurring opinion joined by the other two judges on the panel, Judge Prado suggested that the "Todd/Heasley rule" "may be misguided".  Id. at 351 (Prado, J., concurring).)  The Court of Appeals for the Ninth Circuit followed Todd in its decision in Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), aff'g T.C. Memo. 1988-416.  More recently, in Keller v. Commissioner, 556 F.3d 1056, 1061 (9th Cir. 2009), aff'g in part, rev'g in part T.C. Memo. 2006-131, the court suggested that, were it not "constrained by Gainer", it might follow other circuits and apply an overvaluation penalty in cases like Heasley in which "overvaluation is intertwined with a tax avoidance scheme that lacks economic substance".

Because RERI was dissolved in 2004 and had no principal place of business when petitioner filed his petition in 2008, absent a written stipulation to the contrary the present case would be appealable to the Court of Appeals for the D.C. Circuit rather than the Court of Appeals for either the Fifth or the Ninth Circuit. See sec. 7482(b); RERI Holdings I, LLC v. Commissioner, 143 T.C. 41, 66 (2014).  Therefore, we are not bound by the doctrine of Golsen v. Commissioner,

54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), to apply in the present case the rule announced in Todd and upheld by the Court of Appeals for the Fifth Circuit in its affirmance of our decision in that case and also applied by the Court of Appeals for the Ninth Circuit in Gainer. Instead, under stare decisis, the principle we adopted in AHG in overruling both Todd and McCrary governs the present case.

C.    The SMI's Value

Because RERI did not meet the substantiation requirement provided in section 1.170A-13(c)(2), Income Tax Regs., the value of the SMI that RERI contributed to the University is irrelevant to the issue of the amount of the deduction to which the partnership is entitled for that contribution. Nonetheless we must determine the SMI's value to decide whether the value RERI claimed on its return resulted in a gross or substantial valuation misstatement within the meaning of section 6662(e)(1) or (h)(2).

As noted above, the amount of a contribution of property other than money is generally measured by the property's fair market value at the time of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. A property's fair market value "is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and

both having reasonable knowledge of relevant facts."  Sec. 1.170A-1(c)(2), Income Tax Regs.

In most cases, the willing buyer-willing seller standard is not applied directly to annuities, life estates, terms of years, remainders, reversions, and similar partial interests in property.  Instead, those interests are generally valued under tables prescribed by the Secretary that divide the fair market value of the underlying property among the several interests in the property on the basis of their present values, determined using a prescribed interest rate.  See sec. 7520(a).

1.      Applicability of Section 7520

Section 1.7520-3, Income Tax Regs., limits the application of the standard actuarial factors provided in the section 7520 tables.  Under that regulation, the standard factors apply to value a remainder interest only if the agreements governing the property provide adequate protection to the holder of that interest. Sec. 1.7520-3(b)(2)(iii), Income Tax Regs.  Those protections must be "consistent with the preservation and protection that the law of trusts would provide for a person who is unqualifiedly designated as the remainder beneficiary of a trust for a similar duration".  Id.  The protective provisions must "assure that the property will be adequately preserved and protected (e.g., from erosion, invasion, depletion, or damage) until the remainder * * * interest takes effect in possession and

enjoyment." Id. The "provisions of the arrangement and the surrounding circumstances" must manifest "the transferor's intent * * * that the entire disposition provide the remainder * * * beneficiary with an undiminished interest in the property transferred at the time of the termination of the prior interest." Id.

In addition, the standard actuarial factors provided in the section 7520 tables generally may not be used to value a remainder interest that is a "restricted beneficial interest". Sec. 1.7520-3(b)(1)(ii), Income Tax Regs. A remainder interest is a restricted beneficial interest if it "is subject to a contingency, power, or other restriction, whether the restriction is provided for by the terms of the trust, will, or other governing instrument or is caused by other circumstances." Id.

When the standard table factors cannot be used to value a remainder interest, its "actual fair market value" must be determined on the basis of all of the facts and circumstances, without regard to section 7520. Sec. 1.7520-3(b)(1)(iii), Income Tax Regs.

The threshold question in determining whether the value of the SMI that RERI reported on its return resulted in a gross or substantial valuation misstatement within the meaning of section 6662(e)(1) or (h)(2) is whether the value of that property must be determined under section 7520. Respondent argues that the SMI is a restricted beneficial interest and that it does not meet the

adequate protection requirement of section 1.7520-3(b)(2)(iii), Income Tax Regs.

Regarding that requirement, respondent observes that, unlike the holder of a

remainder interest in trust, the SMI holder could not sue the TOYS holder for

breaches of fiduciary duty. Moreover, respondent notes: "[T]he only recourse

available to the SMI holder in the event the TOYS holder sells, exchanges, wastes,

or overly encumbers the Hawthorne Property * * * is to take immediate possession

of the now-damaged TOYS interest or property." We agree with respondent that

the inability of the SMI holder to recover damages for waste or other acts that

prejudice its interests exposes the SMI holder to a sufficient risk of impairment in

value that the SMI holder does not enjoy a level of protection consistent with that

provided by the law of trusts.[13] Because we conclude that the SMI does not meet

the adequate protection requirement of section 1.7520-3(b)(2)(iii), Income Tax

Regs., we need not consider respondent's arguments for treating the SMI as a

---

[13]We do not agree with respondent, however, that the absence of a fiduciary duty owed by the TOYS holder to the SMI holder is dispositive. As petitioner argues, if the mere absence of a fiduciary relationship between term and remainder holders violates the adequate protection requirement of sec. 1.7520-3(b)(2)(iii), Income Tax Regs., then no remainder interest created outside a trust could be valued under sec. 7520. In RERI Holdings I, LLC v. Commissioner, 143 T.C. 41, 58 (2014), as petitioner observes, we rejected his argument that the adequate protection requirement applies only to interests in trust. If the adequate protection requirement applies to interests created outside of trusts as well as to interests in trust property, it must be that the absence of a fiduciary relationship does not violate that requirement.

restricted beneficial interest within the meaning of section 1.7520-3(b)(1)(ii), Income Tax Regs.

The commission of waste would not only breach the Assignment that created the SMI; it would also violate the TOYS holder's duty to the SMI holder under New York law. See N.Y. Real Prop. Acts. Law sec. 801 (McKinney 2009) (providing for action for waste against tenant for years who commits waste upon real property); Estate of Gaffers, 5 N.Y.S.2d 671, 677 (App. Div. 1938) ("It is a general rule that a tenant for life * * * must pay the taxes and make all ordinary, reasonable and necessary repairs required to preserve the property and prevent its going to decay or waste[.]"). But the exculpatory provision in the Assignment should be interpreted to limit liability for breaches not only of the covenants included in that agreement but also of general duties under New York law. See The Travelers Ins. Co. v. 633 Third Assocs., 973 F.2d 82 (2d Cir. 1992). Travelers considered whether a creditor had standing under a fraudulent conveyance statute to set aside distributions by a partnership debtor to its partners. The creditor argued that the distributions left the partnership with inadequate funds to pay taxes on the property that secured the debt and that the partnership's failure to pay taxes violated its duties to the creditor to preserve the value of the mortgaged property. The partnership argued that the distributions did not

prejudice the creditor's rights because, under the loan agreement, its remedies in the event of breach were limited to foreclosure on the property. Thus, even if the partnership, as mortgagor, had breached its duties to the creditor by failing to pay taxes on the mortgaged property, the creditor would not have been entitled to damages. Its remedy would have been limited to taking possession of the property (subject to a lien for the unpaid taxes). The creditor argued that, but for the distributions in issue, it could have collected damages under a tort action for waste. The Court of Appeals for the Second Circuit disagreed, reading the exculpatory clause in the parties' agreement as foreclosing damages under tort actions as well as for breaches of the mortgagor's contractual obligations. "Denominating the action as one sounding in tort, as urged by plaintiff", the court reasoned, "does not save it." Id. at 84-85.[14] Similarly, we conclude that New York courts would not have allowed the SMI holder to avoid the exculpatory provision included in the Assignment by denominating its action against the TOYS holder as

---

[14]Despite its conclusion in The Travelers Ins. Co. v. 633 Third Assocs., 973 F.2d 82 (2d Cir. 1992), that the creditor-plaintiff would not have been entitled to damages for the partnership-debtor's failure to pay property taxes on the mortgaged property, the Court of Appeals for the Second Circuit vacated the lower court's dismissal of the creditor's action because of the possibility that, but for the distributions in issue, the creditor might have been able to bring an equitable action to require the partnership to pay the taxes.

one for breach of the TOYS holder's duties under New York law, rather than for breach of the covenants included in the Assignment.

As shown above, the holder of a remainder interest in property, even outside of a trust, would be protected against waste and other actions that would impair the value of the property. The holder of a remainder interest in trust, as the beneficiary of a fiduciary duty owed by the trustee, would enjoy, if anything, even greater protection. See generally 3 Restatement, Trusts 3d, secs. 77-79 (2007) (addressing duties of prudence, loyalty, and impartiality that constitute the fundamental standards of fiduciary conduct in trust administration). Therefore, a fortiori, the exposure of the SMI holder to the risk of impairment in the value of its interest due to waste or other adverse actions means that the SMI holder does not enjoy a level of protection consistent with that provided by the law of trusts. Cf. sec. 1.7520-3(b)(2)(iii), Income Tax Regs. Consequently, the value of the SMI, for the purpose of determining the amount of the deduction to which RERI would have been allowed for its contribution of that property to the University had the partnership complied with the substantiation requirements of section 1.170A-13(c)(2), Income Tax Regs., would not have been the SMI's present value determined under section 7520. Id. Instead, the amount RERI would have been entitled to deduct would have been "the actual fair market value of the * * * [SMI]

(determined without regard to section 7520) * * * based on all of the facts and circumstances".  Sec. 1.7520-3(b)(1)(iii), Income Tax Regs.

> 2.     The Value of the SMI Based on All of the Facts and
> Circumstances

> > a.     The Three Fundamental Components of the SMI's Value

The value of the SMI on August 27, 2003, the date that RERI assigned it to the University, turns on three amounts:  (1) the projected cashflow from the Hawthorne property for 2021, (2) the expected growth rate in cashflows thereafter, and (3) the discount rate applied to determine the present value of the post-2020 cashflows as of the valuation date.  In particular, the value of the SMI as of August 27, 2003, can be expressed by the following formula:

$$(2021\text{CF} \div (r - g)) \times (1 \div (1 + r)^{17.33})$$

where "2021CF" is the projected cashflow from the Hawthorne property for 2021, "r" is the discount rate, and "g" is the projected growth rate in cashflows after 2021.  The first phrase in the formula $(2021\text{CF} \div r - g))$ determines the value, as of January 1, 2021, of all remaining cashflows from the property by capitalizing projected 2021 cashflow in perpetuity[15] at a rate equal to the excess of the discount

---

[15]We recognize, of course, that the Hawthorne property cannot be expected to produce rental income indefinitely without further material capital investments. Respondent did not refute the determination by petitioner's expert Mr. Myers that

(continued...)

rate over the growth rate. The second phrase in the formula $(1 \div (1 + r)^{17.33})$ is simply a discount factor that discounts the January 1, 2021, value back 17.33 years to the date of the gift.

### b. The Analyses of the Three Principal Experts

Although the detailed mechanics employed by the experts who offered testimony at trial differed somewhat, each expert's conclusion can be expressed in terms of the formula shown above. For example, petitioner's expert Mr. Myers projected 2021 cashflow at $8,107,588 and assumed that cashflow would increase 3% per year. The $16,550,000 value Mr. Myers assigned to the SMI effectively discounts post-2020 cashflows at a rate of about 11.01% (that is, ($8,107,588 $\div$ (.1101 − .03)) × (1 $\div$ 1.1101$^{17.33}$) $\cong$ $16,550,000).

By contrast, Dr. Cragg, who testified on behalf of respondent, valued the SMI as of August 27, 2003, at about $2.09 million. Dr. Cragg's analysis implies a

---

[15](...continued)
the Hawthorne property would have an estimated useful life of 65 years and an effective age of 38 years in 2021. Those figures suggest that the property's useful life would end in 2048. (If the property had a 65-year total life and an effective age of 38 years in 2021, it would have 27 years in its useful life then remaining.) The parties' experts generally ignored the limited useful life of the Hawthorne property and computed the SMI's value by capitalizing projected cashflows in perpetuity. We have confirmed that taking into account an assumed cessation of rental income after 2048 would not materially affect the SMI's value.

projected 2021 cashflow of $6,663,325.[16]  He derived that amount by accreting at 3.29% the rent provided for the final year of the initial period of the AT&T lease. Dr. Cragg discounted his projected future cashflows at a rate of 18.99% (that is, ($6,663,522 ÷ (.1899 − 0.0329)) × (1 ÷ 1.1899^{17.33}) ≅ $2,090,000).  Dr. Cragg derived his 18.99% discount rate from the price at which Hawthorne bought the Hawthorne property from Intergate in February 2002.  Dr. Cragg reasoned that Intergate and Hawthorne implicitly valued post-May 2016 cashflows at that rate, which reflects a risk premium of 13.39% over the February 2002 long-term applicable Federal rate (AFR) of 5.6%.  Rev. Rul. 2002-5, 2002-1 C.B. 461.

Respondent's other expert, Mr. Abraham, determined that the SMI was worth $3,382,000 as of August 27, 2003.  Mr. Abraham projected 2021 cashflow of $6,586,595, which he derived from the forecast of rental income made in the Bonz/REA appraisal.  Mr. Abraham's report includes a stated assumption that rent would increase after 2017 at 3%, although his projected rents actually increase at only 2.5% per year.  (His report fails to explain that discrepancy.)  Given those assumptions, Mr. Abraham implicitly discounts his projected post-2020 cashflows

---

[16]Dr. Cragg projected cashflow of $6,451,084 for 2020 and assumed an annual growth rate of 3.29%.  Thus, his analysis implies a projected cashflow for 2021 of $6,451,084 × 1.0329, or $6,663,325.

from the Hawthorne property at a rate of 16.44% (that is, (\$6,586,595 ÷ (.1644 −

.025)) × (1 ÷ $1.1644^{17.33}$) ≅ \$3,382,000).

Mr. Abraham purported to apply a discount rate of 18%, which he derived

by adding to an assumed risk-free rate premiums attributable to equity investments

in relatively small entities. Mr. Abraham's effective discount rate, however, was

less than the rate he professed to apply because, at the end of the time horizon in

each of the scenarios he considered (using alternative assumptions regarding

AT&T's exercise of renewal options), he capitalized the assumed final period rent

at a rate of only 10.5%. Capitalizing at 10.5% cashflows expected to grow at 2.5%

per year is akin to discounting those cashflows at 13% (10.5% + 2.5%). Thus, Mr.

Abraham applied an 18% discount rate to cashflows within each assumed time

horizon and a 13% discount rate to cashflows thereafter. We can think of no

justification for that approach: If anything, cashflows further in the future should

be discounted at a higher rate, reflecting the greater uncertainty inherent in

projecting them.[17] Whatever the conceptual merit of Mr. Abraham's approach, it is

---

[17]Mr. Abraham relied on the Bonz/REA appraisal for his 10.5% capitalization rate. That appraisal, however, employed a 9.5% rate to discount projected cashflows through 2016 and a 12% rate to discount projected cashflows in 2017 and 2018. Bonz/REA then capitalized post-2018 cashflows at 10.5%, which, given an assumed growth rate in rent of 2.75%, was akin to discounting

(continued...)

not surprising that, as an arithmetic matter, his effective discount rate of 16.44% is a blend of his 18% professed discount rate and the sum of his capitalization and assumed growth rates (10.5% + 2.5%, or 13%).

In summary, the key inputs used by the three principal experts and their resulting conclusions are as follows:

| Expert | 2021 Cashflow | Growth (percent) | Discount (percent) | SMI value |
|---|---|---|---|---|
| Mr. Myers | $8,107,588 | 3 | 11.01 | $16,550,000 |
| Dr. Cragg | 6,663,522 | 3.29 | 18.99 | 2,090,000 |
| Mr. Abraham | 6,586,595 | 2.5 | 16.44 | 3,382,000 |

### c. Evaluating the Experts

#### i. Projected Cashflows

Because respondent presented no evidence to refute Mr. Myers' determination that the rent provided in the AT&T lease was below market as of August 27, 2003, we find Mr. Myers' projected 2021 cashflow more reliable than either Dr. Cragg's or Mr. Abraham's. Because Dr. Cragg simply extrapolated from the final period of the AT&T lease to project rents after May 2016, if the rent provided in the AT&T lease had fallen below market as of the August 27, 2003,

---

[17](...continued)
those cashflows at 13.25% (10.5% + 2.75%). Thus, Bonz/REA, in contrast to Mr. Abraham, applied increasing effective discount rates for longer discount periods.

valuation date, then Dr. Cragg's post-May 2016 projections would have understated projected rental income. Mr. Abraham relied on Bonz/REA projections of rental income, rather than extrapolating from the AT&T rent. He also relied on Bonz/REA for projected expenses, but, unlike Bonz/REA, he failed to consider the lessor's right to reimbursement of most expenses from the tenant. Thus, Mr. Abraham's projected 2021 cashflow is even lower than Dr. Cragg's and even less reliable.

### ii. Applicable Discount Rate

By contrast, we generally find Dr. Cragg's determination of the rate at which to discount post-2020 cashflows to be more credible than Mr. Myers', primarily because Dr. Cragg's analysis gives more account to the difference in risk between the expected cashflows during and after the initial period of the AT&T lease. Dr. Cragg discounted the rent provided for in the initial term of the AT&T lease at an interest rate, 7.92%, intended to estimate AT&T's 14-year borrowing rate as of his valuation date of April 2002. He then determined the rate at which Intergate and RS Hawthorne implicitly discounted what would have been the expected cashflows after the expiration of the initial term of the AT&T lease. It seems plausible that Intergate and RS Hawthorne would discount post-May 2016 projected cashflows more heavily to take into account uncertainties about whether

AT&T would renew its lease, whether a replacement tenant could be found if AT&T declined to renew, and, in either event, what market rents would be at that time.

Mr. Myers' analysis did not differentiate as significantly between pre- and post-May 2016 cashflows. Mr. Myers discounted cashflows up to 2021 using a 9% rate, which he derived in part from the 13-year corporate bond yield. He used the same 9% discount rate to discount post-2020 cashflows back to January 1, 2021. But he used an 11% rate to discount back to August 27, 2003, his projected value of the Hawthorne property as of January 1, 2021. Mr. Myers did not explain why different discount rates should apply to discount post-January 1, 2021, cashflows first back to January 1, 2021, and then from that date back to August 27, 2003.[18]

---

[18]Although Mr. Myers applied rates of both 9% and 11% to discount projected post-2020 cashflows, his overall effective discount rate was just above 11% because he derived a terminal value in 2032, at the end of the period covered by his projections, by capitalizing the final period cashflow at 9%, without adjusting for continued growth in rents. In effect, Mr. Myers' projections assume that annual rent would grow at 3% per year through 2032 and then remain flat thereafter. Had Mr. Myers assumed continued growth in rents (deriving his terminal value by dividing the final period cashflow by the excess of his 9% discount rate over his assumed growth rate of 3%), the value he assigned to the SMI as of August 27, 2003, would have reflected an effective overall discount rate of 11.01%.

Petitioner challenges Dr. Cragg's use of an estimate of the interest rate on AT&T bonds to discount scheduled rent during the initial term of the AT&T lease. Petitioner argues that Dr. Cragg failed to take into account the greater liquidity risk involved in ownership of the Hawthorne property than in ownership of an AT&T bond. We find petitioner's argument unpersuasive, for two reasons. First, although the 7.92% rate that Dr. Cragg used to discount the scheduled rent during the initial term of the AT&T lease did not include an explicit liquidity premium, the rate he used still exceeded the 7.5% rate that petitioner's expert Mr. Myers viewed as appropriate for a "bondable lease structure". Second, because the value of the right to receive rent from AT&T "consists solely in a promised stream of fixed payments", that right is akin to an annuity and is thus "distinct in nature from those interests to which a marketability discount is typically applied." Cf. Estate of Gribauskas v. Commissioner, 116 T.C. 142, 164 (2001), rev'd, 342 F.3d 85 (2d Cir. 2003). As we explained in Estate of Gribauskas, in support of our holding that an inalienable right to annual installments of a lottery prize could be valued using the section 7520 tables:

> [D]iscounts for lack of marketability are most prevalent in valuation
> of closely held stock or fractional interests in property. Such is
> appropriate in that capital appreciation, which can usually be
> accessed only through disposition, is a significant component of
> value. The value of an annuity, in contrast, exists solely in the

anticipated payments, and inability to prematurely liquidate those installments does not lessen the value of an enforceable right to $X annually for X number of years.

Id.; see also Cook v. Commissioner, 349 F.3d 850, 856 (5th Cir. 2003) ("[W]e think it unreasonable to apply a non-marketability discount when the asset to be valued is the right, independent of market forces, to receive a certain amount of money annually for a certain term."), aff'g T.C. Memo. 2001-170.

Petitioner also calls attention to allegedly "strange results" produced by Dr. Cragg's analysis. For example, petitioner claims that Dr. Cragg predicted that the Hawthorne property would have a value in January 2021 of $42.46 million, just slightly above the $42.35 million price for which Hawthorne bought the property from Intergate in February 2002. Petitioner argues that, in the light of Dr. Cragg's projection of increasing rents, "the property could not possibly be worth approximately the same amount in 2021 as in 2002." Petitioner fails to appreciate the import of Dr. Cragg's analysis. The $42.46 million figure petitioner cites is not a prediction of the value the Hawthorne property will have in January 2021. Instead, that figure is an anachronism: It is the value of the remaining projected cashflows as of January 2021, capitalized at a rate that reflects the risk seen in an

investment in the property as of 2002. By 2021, many of the risks perceived in 2002 will have been realized or not.[19]

Petitioner also points to various cliff effects arising from Dr. Cragg's use of a different rate to discount projected cashflows before and after the expiration of the initial term of the AT&T lease in May 2016. For example, petitioner observes that, under Dr. Cragg's analysis, the present value of receiving rent from AT&T in May 2016 is almost four times higher than the present value of receiving projected rent of a larger amount in June 2016. Far from demonstrating fundamental flaws in Dr. Cragg's methodology, as petitioner claims, the comparison of the present value of the projected rents in May and June 2016 simply reflects the greater confidence of receiving the scheduled rent from AT&T in accordance with the

---

[19]Assume, for example, that a property is certain to produce $100,000 of net cashflow each year for 15 years. Thereafter, the property has an equal chance of either producing $100,000 per year for another 15 years or being worthless. If the risk-free rate of return is 5%, an investor would pay $1,287,605 for the property. (The present value of a 15-year annuity of $100,000 discounted at 5% is $1,037,966. The present value of $1,037,966 discounted back 15 years at 5% is $499,279. The assumed purchase price of $1,287,605 equals $1,037,966 + (.5 × $499,279).) That purchase price reflects an implicit discount rate of about 8.885%--that is, a 30-year annuity of $100,000 has a present value, discounted at 8.885%, equal to the assumed purchase price. The cashflow from year 16 to year 30, discounted back to the end of year 15 at 8.885%, would have a value of $811,570. But that amount cannot be viewed as a prediction of the value the property will have at the end of year 15. At that time, the property will be worth either $1,037,966 or zero.

terms of the lease. The rent to be received the following month, after the expiration of the initial lease term, was much less predictable.

Although we generally found Dr. Cragg's approach to deriving an appropriate discount rate more persuasive, his analysis did suffer from being directed at a date other than August 27, 2003, the date of RERI's gift of the SMI to the University. We find inadequate Dr. Cragg's efforts in his rebuttal report to revise his analysis to derive a value for the SMI as of the date of the gift. It appears that Dr. Cragg simply applied his 18.99% rate to discount projected post-2020 cashflows back to August 27, 2003, instead of back to his initial valuation date of April 1, 2002. That approach might have been defensible in the absence of evidence that interest rates or projections of future rents changed between April 1, 2002, and August 27, 2003. In fact, however, on the basis of Mr. Myers' evaluation of comparable properties, it appears that market rents increased during that period so that the rent provided in the AT&T lease, which Bonz/REA determined to be below market at the outset of the lease, had fallen even further below market by August 27, 2003. In addition, general interest rates declined between February 2002 (the date of the arm's-length sale of the Hawthorne property from which Dr. Cragg derived his 18.99% discount rate) and August 2003. Therefore, even in the absence of reason to believe that the appropriate

credit spread for post-March 2016 rents from the Hawthorne property would have changed between February 2002 and August 27, 2003, Dr. Cragg's 18.99% discount rate failed to reflect changes in general interest rates during that period.

On the basis of the considerations described above, in determining the appropriate rate at which to discount projected post-2020 cashflows from the Hawthorne property, we have adjusted Dr. Cragg's 18.99% rate to reflect changes in the AFR between February 2002 and August 2003. In other words, we conclude that the projected cashflows should be discounted at a rate of 17.75%, equal to the sum of the 13.39% risk premium Dr. Cragg determined and the 4.36% long-term AFR for August 2003.[20] Rev. Rul. 2003-94, 2003-2 C.B. 357.

Applying a discount rate of 17.75% to the post-2020 cashflows from the Hawthorne property, as projected by Mr. Myers, would result in multiple valuation allowances for the risk that the Hawthorne property would go vacant after the initial term of the AT&T lease, should AT&T not renew its lease, or that any

---

[20]We are not persuaded that Mr. Abraham's analysis, which applied an effective discount rate of 16.44%, justifies using a discount rate below the 17.75% rate we have chosen. Mr. Abraham's analysis was flawed by his use of a capitalization rate lower than the difference between his professed discount rate of 18% and his assumed 2.5% growth rate. The rough equivalence between Mr. Abraham's professed 18% discount rate (in contrast to the effective rate he actually employed) and the 17.75% rate we determine to be appropriate appears to be coincidental.

replacement tenant would be less creditworthy. Those risks were presumably among those taken into account in the risk premium that Dr. Cragg derived from the price that Hawthorne paid for the Hawthorne property. But Mr. Myers accounted for those risks separately, not by using a higher rate to discount post-May 2016 cashflows but by reducing those cashflows by increased estimates of vacancy or credit losses. Therefore, in determining the projected cashflows to which to apply our selected discount rate, we will add back to Mr. Myers' projected 2021 cashflow of $8,107,588 his estimated vacancy/credit loss for that year of $561,688.

We thus conclude that the SMI that RERI contributed to the University on August 27, 2003, had a fair market value, as of that date, of $3,462,886, which equals the present value of the post-2020 cashflows from the Hawthorne property, as projected by Mr. Myers, without regard to his estimates of vacancy/credit losses, discounted back to the valuation date at a rate of 17.75%. Stated in terms of the formula presented supra part III.C.2.a, $3,462,886 = (($8,107,588 + $561,688) ÷ (.1775 − .03)) × (1 ÷ $1.1775^{17.33}$).

D.  Application of Arithmetic Threshold for Gross Valuation
Misstatement

It follows from our determination that the SMI was worth $3,462,886 when RERI contributed it to the University on August 27, 2003, that the partnership's claim of a charitable contribution deduction of $33,019,000 resulted in a gross valuation misstatement.  Under section 6662(h)(2), a property value claimed on a return results in a gross valuation misstatement if that value is 400% or more of the property's correct value.  The $33,019,000 value that RERI assigned to the SMI in claiming a deduction for its contribution of the property to the University is 953.5% of the amount that we have determined to be the SMI's correct value.  In fact, RERI's claim of a deduction of at least $13,851,544 ($3,462,886 × 4) would have resulted in a gross valuation misstatement.  (Conversely, RERI's claimed deduction would have resulted in a gross valuation misstatement as long as the SMI's actual value was no greater than $8,254,750 ($33,019,000 ÷ 4)).  Thus, we conclude that respondent has met his burden of production under section 7491(c) regarding the appropriateness of the gross valuation misstatement penalty.  In particular, any underpayment of tax resulting from the disallowance of RERI's claimed charitable contribution deduction would be attributable to a gross

valuation misstatement to the extent that the underpayment reflects the excess of the $33,019,000 value that RERI claimed for the SMI over $3,462,886.

E.      The Reasonable Cause Exception

Petitioner argues that any underpayment attributable to a redetermination of RERI's claimed charitable contribution deduction should not be subject to the gross or substantial valuation misstatement penalty of section 6662(e)(1) and (h)(2), regardless of the amount determined to be the SMI's correct fair market value on the date of RERI's gift, because of the existence of reasonable cause for the portion of the underpayment that would otherwise be subject to penalty. Petitioner acknowledges that, under section 6664(c)(2), RERI has no reasonable cause defense unless its claimed deduction was supported by a qualified appraisal and the partnership's own good-faith investigation of the SMI's value. Petitioner argues: "In the case of a remainder subject to section 7520, 'a good faith investigation of the value of the contributed property' should be interpreted to require an investigation of the value of the fee estate, since the remainder value is determined under section 7520 by arithmetic formula." Petitioner claims that, because Hawthorne acquired the Hawthorne property from an unrelated seller in February 2002 for $42.35 million, and because Bonz/REA valued the property at $47 million as of August 2001 in connection with the loan that financed

Hawthorne's acquisition of the property, "it was reasonable for RERI to conclude that the Gelbtuch Appraisal represented a reasonable estimate of value."

Respondent challenges petitioner's reasonable cause argument on two grounds. First, respondent claims that the Gelbtuch appraisal is not a qualified appraisal. Second, he claims that RERI acquired the SMI solely to achieve a tax deduction for its partners in an amount far greater than RERI's purchase price, that RERI and its partners were indifferent to the SMI's actual value and failed to perform any due diligence in that regard, and that, consequently, RERI did not make a "good faith investigation of the value of the contributed property" within the meaning of section 6664(c)(2).

Respondent's assertion of the gross valuation misstatement penalty for the first time in an amendment to his answer raises the question of which party bears the burden of proof in regard to the availability of the reasonable cause exception to that penalty. As a general rule, once the Commissioner satisfies his burden of production under section 7491(c) establishing the appropriateness of a determined penalty, the taxpayer then bears the burden of proving that exculpatory factors such as reasonable cause prevent the imposition of the penalty. See Higbee v. Commissioner, 116 T.C. at 446-447. Nonetheless, under Rule 142(a), the Commissioner bears the burden of proof "in respect of any new matter, increases

in deficiency, and affirmative defenses, pleaded in the answer". Thus, while petitioner bears the burden of proving reasonable cause as a defense to the substantial valuation misstatement penalty that respondent determined in the FPAA, if the gross valuation misstatement penalty that respondent asserted by amendment to his answer is either a "new matter" or an "increase in deficiency", within the meaning of Rule 142(a), then respondent would bear the burden of proving the absence of reasonable cause to justify the imposition of that penalty. If so, each party would bear the burden of proving the same facts for different purposes.

On at least two occasions, we have held that, when the Commissioner increases a penalty in his answer, the burden of proof in regard to the applicability of a reasonable cause defense is divided between the parties: In defending against the penalty initially determined, the taxpayer bears the burden of proving reasonable cause, while the Commissioner, to justify the asserted increase in the penalty, must prove the absence of reasonable cause. See Rader v. Commissioner, 143 T.C. 376, 389 (2014), aff'd in part, appeal dismissed in part, 616 F. App'x 391 (10th Cir. 2015); Arnold v. Commissioner, T.C. Memo. 2003-259, 2003 WL 22053838, at *4.

A subsequent increase in the amount of an asserted penalty, however, may not affect the evidence the taxpayer must produce to establish reasonable cause. If the existence of reasonable cause as a defense to both the penalty initially determined and the increased penalty "is completely dependent upon the same evidence", there might be "little practical reason to shift the burden of proof." Shea v. Commissioner, 112 T.C. 183, 197 n.22 (1999). In such a case, "[t]he taxpayer would not suffer from lack of notice concerning what facts must be established." Id.

Moreover, while Rule 142(a) lists "new matters" and "increases in deficiency" as separate grounds for shifting the burden of proof, our cases have generally treated the effect of a change in the Commissioner's position on the amount of the asserted deficiency as relevant to the question of whether the change results in a "new matter". For example, in Sanderling, Inc. v. Commissioner, 66 T.C. 743, 758 (1976), aff'd in part, 571 F.2d 174 (3d Cir. 1978), we considered the Commissioner's assertion in an amendment to his answer of an increased addition to tax for late filing. We concluded that the Commissioner bore the burden of proof in regard to the increased addition to tax because it was a "new matter". In support of that conclusion, we observed that "respondent's new position requires the presentation of different evidence and cannot be said to

simply clarify or develop his original determination." Id. "Further," we added, "we are strongly influenced by the fact that * * * [the Commissioner] seeks an increased deficiency by way of his amended answer." Id. Thus, we treated the effect of the Commissioner's change in position on the relevant evidence and the amount of the deficiency as factors supporting the conclusion that the change resulted in a "new matter" within the meaning of Rule 142(a). We did not treat the increase in the deficiency as a separate ground, in its own right, to shift the burden of proof to the Commissioner.

We might have occasion in an appropriate case to reconsider the conclusions we reached in Rader and Arnold that, under Rule 142(a), any position advanced by the Commissioner in his answer that increases the amount of a determined deficiency necessarily shifts the burden of proof, even if that new position has no effect on the evidence the taxpayer is required to present. The present case, however, does not provide that occasion. For the reasons explained below, we conclude that, even if respondent must prove that RERI did not make a good-faith investigation of the SMI's value to justify the asserted gross valuation misstatement penalty, he has met that burden.

Although the Code and the regulations do not specify what constitutes a "good faith investigation", the taxpayer must do more than simply accept the result

of a qualified appraisal for the requirement of section 6664(c)(2)(B) to have any meaning. Whitehouse Hotel Ltd. P'ship v. Commissioner, 139 T.C. at 352-353. Petitioner claims that RERI's acceptance of the value Mr. Gelbtuch assigned to the fee interest in the Hawthorne property as of August 2003 was supported by the price Hawthorne paid to acquire the property in February 2002 and Bonz/REA's appraisal of the property as of August 2001. But those allegedly confirming data cannot justify RERI's acceptance of the results of the Gelbtuch appraisal unless the partnership (through its partners or, perhaps, advisers) was aware of those data and took them into account in determining the amount to claim as a deduction for its contribution of the SMI to the University. The record provides no evidence on that factual question. Nonetheless, because we treat respondent as bearing the burden of proving that RERI did not make a good-faith investigation of the SMI's value to justify the asserted gross valuation misstatement penalty, we will assume that RERI's partners or advisers did discover through investigation the terms on which Hawthorne acquired the Hawthorne property in February 2002 and the value that Bonz/REA assigned to the property as of August 2001 and took that information into account in arriving at a value to assign to the SMI on RERI's 2003 return.

Having resolved the relevant factual question regarding RERI's efforts in investigating the SMI's value, we now face the legal question of whether the allegedly confirming data justified RERI's acceptance of the value Mr. Gelbtuch assigned to the Hawthorne property. On that question, petitioner's own arguments challenging Dr. Cragg's valuation of the SMI work against him. In seeking to undermine Dr. Cragg's conclusion regarding the SMI's value on August 27, 2003, which is based, in part, on the price Hawthorne paid for the Hawthorne property in February 2002, petitioner argues: "The value of the property as of February 2002 * * * is of minimal probative value and borders on irrelevant." We agree that evidence of the Hawthorne property's value in February 2002, much less the August 2001 date of the Bonz/REA appraisal, is of limited worth in assessing the property's value in August 2003. Marshaling evidence of a property's value 18 months or more before a gift is simply not sufficient as a matter of law to qualify as a good-faith investigation into the value of the property at the time of the gift.[21]

---

[21]In appropriate circumstances, a taxpayer's commissioning of a second, contemporaneous appraisal may support finding a good-faith investigation within the meaning of sec. 6664(c)(2)(B). See, e.g., Whitehouse Hotel Ltd. P'ship v. Commissioner, 755 F.3d 236, 250 (5th Cir. 2014) ("Obtaining a qualified appraisal, analyzing that appraisal, commissioning another appraisal, and submitting a professionally-prepared tax return is sufficient to show a good faith investigation as required by law."), aff'g in part, vacating in part 139 T.C. 304 (2012). Whitehouse Hotel involved a partnership's contribution of a charitable

(continued...)

Therefore, assuming that respondent has the burden of proving that RERI did not make a good-faith investigation of the SMI's value to justify the asserted gross valuation misstatement penalty, we conclude that respondent has met that burden. Consequently, regardless of whether the Gelbtuch appraisal is a qualified appraisal within the meaning of section 1.170A-13(c)(3), Income Tax Regs., RERI did not have reasonable cause for, or act in good faith with respect to, its claim of a charitable contribution deduction that resulted in a gross valuation misstatement.

F.    Conclusion

For the reasons described above, we conclude that RERI's claimed deduction for its contribution of the SMI to the University resulted in a gross valuation misstatement within the meaning of section 6662(h)(2). Further, any underpayment of tax resulting from our disallowance of that deduction would be attributable to a gross valuation misstatement to the extent that the underpayment reflects the excess of the $33,019,000 value that RERI claimed for the SMI over

---

[21](...continued)
conservation easement. Because the second, allegedly confirming appraisal did not determine the value of the servitude, we concluded that it "d[id] not constitute an investigation, in good faith or otherwise, of the value of the servitude." Whitehouse Hotel Ltd. P'ship v. Commissioner, 139 T.C. at 356. Unlike the Bonz/REA appraisal on which petitioner in this case purports to rely, however, the second appraisal in Whitehouse Hotel was contemporaneous with the partnership's gift.

$3,462,886--the amount that we have determined to be its value as of the date of the gift.  Although the liability of a particular partner for the gross valuation misstatement penalty will depend on the arithmetic threshold provided in section 6662(e)(2), no partner will be able to avoid the penalty on the basis of the reasonable cause exception provided in section 6664(c).

<u>Decision will be entered under</u>

<u>Rule 155</u>.